`          IN THE SUPREME COURT OF MISSISSIPPI

NO. 2006-CA-00218-SCT

*THE TUPELO REDEVELOPMENT AGENCY*

*v.*

*THE GRAY CORPORATION, INC.*

*AND*

*THE GRAY CORPORATION, INC.*

*v.*

*RONALD J. RAGLAND, SR. d/b/a RAGLAND ENGINEERING AND RAGLAND CONSTRUCTION*

*AND*

*RONALD J. RAGLAND, SR. d/b/a RAGLAND ENGINEERING AND RAGLAND CONSTRUCTION*

*v.*

*THE TUPELO REDEVELOPMENT AGENCY*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/12/2006 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KEVIN B. SMITH |
| | GUY W. MITCHELL |
| | WILLIAM DANIEL PRESTAGE |
| | WILLIAM G. ARMISTEAD, SR. |
| ATTORNEYS FOR APPELLEES: | B. SEAN AKINS |
| | THOMAS W. PREWITT |
| | KENNETH MARTIN HEARD, III |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL:  AFFIRMED; ON CROSS-APPEALS:  AFFIRMED - 10/18/2007 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**BEFORE DIAZ, P.J., CARLSON AND RANDOLPH, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     After a jury trial, the Circuit Court of Lee County entered a judgment in favor of the Gray Corporation, Inc., and against the Tupelo Redevelopment Agency for $258,118; and likewise entered a judgment in favor of Ronald J. Ragland, Sr., d/b/a Ragland Engineering and Ragland Construction and against the Gray Corporation for $1,216,605.20.  The Tupelo Redevelopment Agency appeals from the judgment entered against it, and the Gray Corporation, Inc., and Ronald J. Ragland, Sr., d/b/a Ragland Engineering and Ragland Construction, cross-appeal.  After consideration of the record before us and the applicable law, we affirm on all issues raised both in the direct appeal and the cross-appeals.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2.     On October 20, 2000, the Tupelo Redevelopment Agency (TRA) entered into a contract with the Gray Corporation, Inc. (Gray) for the construction of the Tupelo Fairgrounds Redevelopment Project (the Project).  Gray was bonded by the Hartford Fire and Insurance Company (Hartford). The original price contemplated by the contract was $1,725,347.08 and consisted of three components: Component A, water and sewer improvements; Component B, site work; and Component C, electrical, CATV, telephone and duct system.  Allen & Hoshall provided the electrical plan and specifications to TRA for

2

Component C of the Project. Jesco, Inc. (Jesco)[1] was hired to serve as Construction Manager, and Tupelo Water & Light (TWL) was hired to inspect and approve the Component C work. For the Component C work, Gray[2] entered into a oral subcontract with Ronald Ragland, Sr., d/b/a Ragland Engineering and Ragland Construction (Ragland),[3] whereby Ragland agreed to perform some of the layout work contemplated by Gray's contract with TRA, and to construct portions of the Project.

¶3. After beginning work on Component C, Ragland noticed there were problems with the plans given to it by Gray. After Allen & Hoshall spent nearly three months trying to correct the electrical plans and specifications with no solution, TRA, Jesco and Allen & Hoshall enlisted Ragland's help to properly identify quantities of work and the scope of the Project requirements. Because these revisions required extra work on the part of Gray and Ragland, TRA, through its representative Jesco, promised Gray and Ragland a future change order. On February 15, 2001, Ragland presented Brister with a narrative explaining the need for a change order to the Project. On March 2, 2001, Gray obtained change order number

---

[1] Jesco's employee Steve Brister was the primary construction manager. As Jesco's primary construction manager, Steve Brister's scope of employment was to "manage the project, to be the owner's liaison, eyes and ears on the project on a day-to-day basis."

[2] In accordance with Miss. Code. Ann. § 31-5-51 (Rev. 2005), Gray, as principal, and Hartford, as surety, executed a payment bond under which Gray and Hartford jointly and severally agreed to promptly pay all persons supplying labor and materials in the prosecution of the work required by the Project.

[3] Mr. Ragland is a professional engineer, a registered land surveyor and a licensed contractor.

1, as required by the contract terms with TRA, for modifications to the electrical plan and specifications to Component C. Additionally, Gray requested and received two more change orders, number 2 and number 3. The three change orders brought about net additions of $283,209.20 to the original contract terms. Gray and Ragland proceeded with the contemplated work on the Project without receiving any additional change orders for any extra work or time delays associated with Component C.[4]

¶4. After Ragland completed the work and requested payment from Gray, which was never received, Ragland made a *ore tenus* motion to intervene in a suit which already had been filed in the Circuit Court of Lee County, styled "W.G. Construction, Inc. v. The Gray Corporation, Inc. and The Hartford Fire and Insurance Company," civil cause number CV02-133(G)L on the docket of that court.[5] The motion to intervene was granted on August 12, 2002.

¶5. Thereafter, Ragland filed an intervention complaint against Gray and Hartford. In the complaint, Ragland alleged:

> Ragland's work at the project was made difficult, more costly, and time consuming by Gray and/or third parties for which Gray is responsible. In

---

[4]However, Gray and Ragland contend that since the changes were ongoing and delays were mounting, TRA promised to issue a "final change order" to address all outstanding issues. Such final change order was never issued by TRA due to the disputes which arose at the end of the Project and Gray's request for equitable adjustment.

[5]On October 29, 2003, the circuit court entered an Agreed Order Dismissing with Prejudice the Claims of W.G. Construction, Inc. and the Derivative Third-Party Claims Asserted by the Gray Corporation, Inc. Against the Tupelo Redevelopment Agency Which are Premised on the Claims of W.G. Construction, Inc.

4

addition to the work that it initially contracted to perform, Ragland was required by Gray to perform and did perform additional and different work than the work originally contemplated by the parties. Further, Ragland was unable to perform its work in the manner originally contemplated and as scheduled. It was denied access to portions of the work; Ragland's construction efforts were interfered with; and, Ragland encountered different conditions at the project than had been reasonably anticipated. Likewise, Gray improperly performed administrative tasks and aspects of the project were changed. As a consequence of all of the above, Ragland became entitled to additional compensation and although Ragland was entitled to additional contract time, Gray continued to insist that Ragland perform at an unreasonable rate.

Ragland periodically billed Gray for its work; however, although Gray made some payments, Gray refused and still refuses to pay Ragland $534,454.11 being the total amount due it and which has been due for many months.

Based on Ragland's allegations, Ragland's prayer for relief is as follows:

WHEREFORE, PREMISES CONSIDERED, Ronald J. Ragland, Sr. demands judgment against The Gray Corporation, Inc. and The Hartford Fire and Insurance Company in the amount of at least Five Hundred Thirty-Four Thousand, Four Hundred Fifty Four Dollars and 11/cents ($534,454.11), plus pre-judgment interest, the penalty and interest required by § 31-5-27 Miss. Code Ann. (Supp. 2001), interest, costs and attorneys fees anticipated under § 31-5-57 Miss. Code Ann. (Supp. 2001).

Both Gray and Hartford filed Answers and Affirmative Defenses on September 23, 2002, denying any liability. Particularly, Gray and Hartford contended that Ragland:

engaged in a direct relationship with the owner [TRA] and architect for the Project, made agreements directly with the Owner and Architect and not as a subcontractor to Gray. As a result, Gray [and Hartford] ha[ve] no liability to Ragland for any claims Ragland asserts for delays, interference or extra work resulting from work performed on the Project.

5

Gray and Hartford also assert that Gray was not indebted to Ragland for any work Ragland performed as subcontractor; or that Gray had not been paid by TRA and thus was not obligated to pay Ragland.

¶6.     On November 6, 2002, Gray filed a Motion for Leave to File Third-Party Complaint and to File Additional Claims Against the Third Party Defendant, TRA, and on November 22, 2002, the Lee County Circuit Court granted Gray's motion for leave to file a third-party complaint.  Gray filed its third-party complaint on December 5, 2002.

¶7.     In its third-party complaint, Gray asserted, *inter alia*:

> On or about March 1, 2002[6], counsel for Gray made a formal claim for equitable adjustment for additional work, delays and loss in efficiency resulting from the delays and additional work. . . . Gray is entitled to an equitable adjustment in the amount of not less than $771,912.91 for delays. Further, Gray is entitled to recover for extra work in an amount to be determined at trial.
>
> In addition to the amounts due Gray for equitable adjustment to the Contract, the TRA has yet to pay the contract balance for the original contract work [in the amount of $207,551.76].  As a result, Gray has likewise not made final payments to its subcontractor[] Ragland. . . .Gray is not liable pursuant to the terms of its subcontracts and Mississippi law to make final payment to said subcontractors until final payment is received by Gray from the owner, TRA.

¶8.     While Gray admittedly asserts that it is not liable to Ragland, Gray contends that "if Gray is liable to Ragland for work performed or delays encountered on the Project pursuant

---

[6]On December 16, 2002,TRA and Gray entered into a Partial Release and Settlement Agreement, settling all claims except to the extent set forth in the letter dated March 1, 2002. Essentially, the claims reserved by Gray and Ragland were for an "equitable adjustment" for additional work performed beyond the scope of the original contract in the amount of $771,912.91.

to the subcontract between Ragland and Gray, then . . . TRA is liable to Gray under the general contract" and "pursuant to the doctrine of common law indemnity." On October 23, 2003, TRA filed its Answer and Defenses to Third Party Complaint.

¶9.     On May 21, 2004, Gray filed a Motion for Leave to File Amended Third-Party Complaint and To File Additional Claims Against the Third-Party Defendant, Allen & Hoshall Ltd. Architects Engineers ("Allen & Hoshall").[7] On August 3, 2004, the trial judge heard Gray's Motion to File Amended Third-Party Complaint. Concluding that the motion was not well-taken, the trial judge entered an order denying Gray's motion on August 10, 2004.

¶10.    On December 13, 2004, Ragland filed a Motion to Amend Intervention Complaint, alleging that discovery had been conducted, and, based on that discovery, Ragland desired to seek punitive damages against Gray and Hartford. Both Gray and Hartford opposed Ragland's Motion to Amend Intervention Complaint on January 25, 2005, and January 26, 2005, respectively. After a hearing on Ragland's Motion to Amend Intervention Complaint, the trial court entered an order denying the motion on February 23, 2005.

¶11.    Ragland filed yet another Motion to Amend Intervention Complaint on June 27, 2005. However, this motion was based on Ragland's assertion that the amount of damages sought should be increased from $534,454.11 to $1,339,658.63. In addition, Ragland sought to add the allegation that March 1, 2002, should be the date from which prejudgment interest should

---

[7]Allen & Hoshall performed electrical design and construction engineering services for the Project.

begin to run. On July 7, 2005, Gray and Hartford filed a joint Response to Ragland's Motion to Amend Intervention Complaint opposing Ragland's motion on grounds of equitable estoppel and undue delay. In addition, Gray asserted that if Ragland was allowed to amend its Intervention Complaint, Gray should be allowed to amend its Third-Party Complaint against TRA to reflect the relief now being sought by Ragland. Also on July 7, 2005, TRA filed a Motion to Enforce Partial Release and Settlement Agreement detailing an agreement between TRA and Gray, in which Gray released TRA from any further liability except the exact claim for equitable adjustment amounting to $771,912.91, which fixed the claimed amount for equitable adjustment relating to Ragland at $458,178.00. TRA thus claimed that if Gray was found liable to Ragland for an amount exceeding $458,178.00, TRA was not liable for the increased amount. Furthermore, on July 7, 2005, TRA moved for summary judgment on the ground that Gray had failed to come forward with elemental proof to sustain claims for equitable adjustment to the contract. However, Gray and Hartford moved to Strike TRA's Motion for Summary Judgment and Motion to Enforce Partial Release and Settlement Agreement as untimely since these motions were filed just eighteen days prior to trial. In addition, Gray and Hartford filed a motion for an emergency hearing on its motions to strike. On July 14, 2005, Ragland contested TRA's Motion to Enforce Partial Release and Settlement Agreement.

¶12. On July 15, 2005, Gray filed a Response to TRA's Motion for Summary Judgment and in the Alternative for Summary Judgment as to Ragland's Claims. Furthermore, Gray

8

and Hartford filed a Response to TRA's Motion to Enforce Partial Release and Settlement Agreement. Ragland also filed a Response to TRA's Motion for Summary Judgment.

¶13. During a telephone conference on July 22, 2005, the trial judge granted Ragland's Motion to Amend Intervention Complaint. On July 26, 2005, Ragland filed its Amended Intervention Complaint against Gray and Hartford.

¶14. Trial began on July 26, 2005, concluding on August 5, 2005. After hearing all of the evidence, the jury returned verdicts based on special interrogatories submitted by the trial judge. Specifically, the jury rendered a verdict in favor of Ragland and against Gray in the amount of $850,551.32, of which amount Gray and Hartford were found jointly and severally liable for $619,173.32. The jury also rendered a verdict for Gray against TRA in the amount of $258,118.00.

¶15. On August 12, 2005, Ragland filed a Motion for Assessment of Attorney's Fees, Prejudgment Interest and Penalty, which the circuit court heard on September 28, 2005, issuing its order on October 11, 2005. On November 2, 2005, the circuit court entered its Final Judgment, in which the circuit court specifically retained jurisdiction to modify and amend the Judgment.

¶16. On November 2, 2005, TRA filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, For a New Trial, or, in the Alternative, To Alter or Amend the Judgment, or in the Alternative, For a Remittitur. Additionally, on November 10, 2005, Gray and Hartford filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative,

9

For a New Trial, or, in the Alternative, to Alter or Amend the Judgment, or in the Alternative, For a Remittitur.

¶17. On December 13, 2005, the circuit court entered an order reflecting that TRA had paid its judgment in favor of Gray in the amount of $258,118 plus all incurred interest. This payment thus satisfied and cancelled the judgment entered against TRA and in favor of Gray. In addition, satisfaction of the judgment by TRA removed the lien upon all of TRA's property, real, personal or mixed.

¶18. On December 29, 2005, Ragland and Hartford entered into a Full, Final, Absolute Release and Assignment whereby Hartford paid Ragland $475,000 and assigned all of its rights in and to the funds deposited with the Court by TRA. That same day, Ragland filed a Motion to Require the Circuit Clerk To Pay Ragland the Funds TRA Paid into Court. However, on January 6, 2006, TRA filed a Motion to Stay Execution of Money Judgment Proceeds Paid Into The Court By The Tupelo Redevelopment Agency Pending Appeal and To Allow Tupelo Redevelopment Agency's Payment of Judgment Into the Court's Registry To Serve As Sufficient Security For Appeal Or Allow Tupelo Redevelopment Agency To Secure A Supersedeas Bond In An Amount No Greater Than 25% of the Judgment Against It.

¶19. The court dismissed Hartford with prejudice on January 12, 2006, as it had fully paid its judgment. Additionally, the circuit court entered an Amended Final Judgment which reflected the circuit court's decision concerning the amount of attorneys' fees to be assessed against Gray and Hartford; the assessment of the penalty contemplated by Miss. Code Ann.

10

§ 31-5-27; and the rate of post-judgment interest, as well as fixing the date from which post judgment interest would begin to run. As a result, Ragland's judgment against Gray was increased to $1,216,605.20, of which $892,676.00 was the joint and several obligation of Gray and Hartford. Furthermore, the circuit court's order:

(1) Denied TRA's Motion For Judgment Notwithstanding the Verdict or, in the Alternative, For a New Trial, or, in the Alternative, to Alter or Amend the Judgment, or in the Alternative, For a Remittitur;

(2) Denied the Motion For Judgment Notwithstanding the Verdict or, in the Alternative, For a New Trial, or, in the Alternative, to Alter or Amend the Judgment, or in the Alternative, For a Remittitur filed by Gray and Hartford;

(3) Determined that the Judgment entered on November 2, 2005, should bear interest at eight percent per Annum from and after November 2, 2005, until paid;

(4) Granted Ragland's Motion for Assessment of Attorney's Fees, Prejudgment Interest and Penalty and assessed a Penalty on the unpaid contract balance of $123,016.12 in the amount of $18,452.40; and

(5) Granted Ragland's Motion for Assessment of Attorney's Fees, Prejudgment Interest and Penalty and assessed attorney's fees against Gray and Hartford at forty percent of the principal amount of the November 2, 2005, judgment.

¶20. Thereafter, on January 17, 2006, the circuit court entered an Order denying Ragland's Motion to Require the Circuit Clerk to Pay Ragland the Funds TRA Paid into Court and granted TRA's Motion to Stay Execution, allowing TRA to satisfy the requirement of posting a bond equal to 125% of the judgment amount by the posting of an appeal bond equal to 25% of said amount.

11

¶21. Thus, TRA perfected its appeal to this Court on February 1, 2006, asserting four issues:

    (1)    Whether TRA waived enforcement of its contractual rights;

    (2)    Whether statutory and common law safeguards pertaining to public construction contracts limit the liability of TRA;

    (3)    Whether Gray was entitled to maintain a claim for extra-contractual damages;

    (4)    Whether Gray was entitled to indemnification from TRA.

¶22. On February 7, 2006, Gray perfected its cross-appeal to this Court raising one issue as to TRA:

    (1)    Whether Gray was entitled to an additur.

In its cross-appeal, Gray raised five issues as to Ragland:

    (1)    Whether Ragland was entitled to recover on a *quantum meruit* basis;

    (2)    Whether Ragland proved [its] *quantum meruit* damages with reasonable certainty;

    (3)    Whether a new trial or remittitur should be granted;

    (4)    Whether an award for attorney's fees was appropriate when a judgment was based on a *quantum meruit* claim;

    (5)    Whether the award of attorney's fees was excessive.

¶23. Lastly, on February 13, 2006, Ragland filed its notice of cross-appeal, asserting four issues:

    (1)    Whether the circuit court erred in denying Ragland's motion to direct the circuit clerk to pay Ragland the money TRA paid into Court;

12

(2) Whether the circuit court created a disproportionate and irreparable harm to Ragland by removing the judgment lien and then permitting a supersedeas appeal concerning that judgment;

(3) Whether the circuit court erred by not protecting Ragland as a prevailing party;

(4) Whether the circuit court erred in granting TRA's motion to post a supersedeas bond, and/or by posting a bond equal to 25% of the judgment.

## DISCUSSION

¶24. For clarity in our discussion, we have combined and re-worded the issues below.

## I. TRA'S MOTION FOR DIRECTED VERDICT.

¶25. TRA appeals to this Court asserting that its motion for directed verdict should have been granted for four reasons: (1) Gray has not carried its legal burden of showing that TRA waived its contractual rights to require change orders for alleged extra work; (2) TRA has statutory and common-law safeguards which limit its liability; (3) the circuit court erred in allowing the jury to determine whether Gray was entitled to delay damages; and (4) TRA should not be obligated to indemnify Gray.

¶26. The standard of review for a directed verdict is well-settled in Mississippi.

> This Court will consider the evidence in the light most favorable to the appellee [non-movant], giving that party the benefit of all favorable inference [sic] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant [movant] that reasonable [jurors] could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

13

***White v. Stewman***, 932 So. 2d 27, 32 (Miss. 2006) (citing ***Steele v. Inn of Vicksburg, Inc.***, 697 So. 2d 373, 376 (Miss. 1997)).

### *A.* *Waiver of Contractual Rights.*

¶27.    First, TRA contends that Gray has not carried its legal burden of showing that TRA waived its contractual rights to require change orders for alleged extra work.  Particularly, TRA contends that when TRA and Gray entered into a written contract for the construction of the Project on October 20, 2000, the contract had specific provisions regarding changes in the work.  Two such provisions are paragraphs 10.1 and 10.3.  Paragraph 10.1, in the general conditions of the contract, states:

> Without invalidating the Agreement, the Owner may, at any time or from time to time, order additions, deletions or revisions in the Work; these will be authorized by Change Orders.  All such Work shall be executed under the applicable conditions of the Contract Documents.  If any Change Order causes an increase or decease in the Contract Price or an extension or shortening of the Contract Time, an equitable adjustment will be made as provided in Article 11 or Article 12.  A Change Order signed by the Contractor indicates his agreement therewith.

Paragraph 10.3 of the general conditions states:

> Additional Work performed by the Contractor without authorization of a Change Order will not entitle him to an increase in the Contract Price or an extension of the Contract Time, except in the case of an emergency as provided by paragraph 6.25.

Accordingly, TRA asserts that Gray never obtained a change order to cover the extra work asserted by the March 1, 2002, claim letter.  Therefore, according to TRA, it is not obligated to compensate Gray for any additional work outside the contract price which was not covered by change orders number 1, number 2, or number 3.

14

¶28.    However, Gray claims that TRA waived its contractual rights to require change orders for extra work through representations by TRA's agent, Steve Brister. Gray asserts that Brister made continuing promises of a final change order which would compensate Gray and Ragland for any extra work performed. Also, Gray points out that change orders number 1, number 2, and number 3 were all issued after the extra work had begun. Therefore, Gray asserts that Gray and Ragland proceeded with additional work under the reasonable belief that a final change order would be issued by TRA based on TRA's "persistent pattern of conduct."

¶29.    "Generally, a contractor who proceeds with work without procuring a written change order proceeds at his peril." *City of Mound Bayou v. Collins*, 499 So. 2d 1354, 1358 (Miss. 1986). That is to say, "[a] contractor should secure a written change order before beginning additional construction work." *Id*. However, Mississippi has recognized that there are exceptions, "even where the contract requires a change to be executed in writing." *Id.* (citing *Baum & Co. v. Covert*, 62 Miss. 113 (1884)). In fact, a contractor may recover if the extra work was "orally ordered, requested, directed, authorized or consented by the owner or his duly authorized agent." *Id.* at 1358-59 (quoting 2 A.L.R.3rd 620, 661 (1965)). Thus, while TRA's contract with Gray requires a written change order for compensation of extra work, TRA may have waived this contractual provision by a persistent pattern of conduct. Such a determination depended upon the facts and the parties' pattern of conduct, and was a proper jury question.

15

¶30. "With respect to waivers in general, this Court has long held that a party to a contract may by words or conduct waive a right to which he would otherwise have been entitled." *Canizaro v. Mobile Communications Corp.*, 655 So. 2d 25, 29 (Miss. 1995). Therefore, "the writing requirement contained in the contract could itself be waived by the subsequent conduct of the parties." *Id*. (citing *Eastline Corp. v. Marion Apartments, Ltd.*, 524 So. 2d 582, 584 (Miss. 1988)).

¶31. In *Citizens National Bank of Meridian v. L.L. Glascock, Inc*., 243 So. 2d 67 (Miss. 1971), a case which TRA asserts is factually similar to our case today, we refused to allow a contractor compensation for extra work which was not pre-approved by a written change order. In *Glascock*, the owner and contractor entered into a written contract for the demolition of an existing bank building and for the construction of a new bank building upon the same premises. *Id.* at 68. Since encountering the old foundation was anticipated, the contractor surveyed the site for placement of the new concrete piling. *Id*. However, the old concrete piling obstructed the placement of the new piling; thus, the contractor was required to remove the old piling. *Id.* The removal of the old piling was the basis for the contractor's claim because the contractor considered the removal to be extra work not contemplated by the contract. *Id*. While the contractor and engineer disputed whether the engineer ordered the contractor to remove the concrete piling, the fact remained that the contractor did not seek a written change order from the owner before the removal, as required by the contract. *Id.* This Court concluded:

16

> The written contract anticipated every contingency upon which this suit was based. Its very purpose was to forestall imposition of vague claims derivative of custom within the trade with which laymen are often unfamiliar. The owner, being desirous of limiting its financial obligation, should not have its pocketbook exposed to the custom of architects and contractors unless it agrees thereto. In this instance the owner agreed to pay for extra work only if it was authorized in writing prior to its execution. Having contracted directly upon the point, there was no leeway for an award on a quantum meruit basis.

*Id*. at 70-71.

¶32.  However, we find that today's case is distinguishable from *Glascock*. Had Gray never requested nor received previous change orders *after* the start/completion of extra work, TRA would be entirely correct in its assertion that the contract controlled. But those are not the facts before us. While it is true that Brister disputes being aware of extra work above and beyond the work authorized by change orders number 1, number 2, and number 3, or guaranteeing a final change order to cover all extra work, the fact remains that TRA repeatedly issued change orders to Gray *after* work was begun. Never did Gray actually receive a written change order *before* starting extra work. Of significant import is that TRA wanted the Project completed on time. Brister testified that change orders could take up to two weeks to be issued because all agency members had to get together and vote on them. Shawn Gray testified Jesco's project manager repeatedly told Gray that time was of the essence. Shawn Gray particularly stated,

> the project manager for this project, Jesco, directed us in time of essence, in time of essence. You proceed with this work, we'll get a change order. Yes, a change order will come. Yeah, there continued to be changes.

. . . .

17

These were discussions that was (sic) several times a week. So, hey, they told us to proceed with the work. We did. Change order will follow. Yes, it did on three occasions, but it didn't on the final occasions.

So we took that, we was directed to go to work. Yeah, promised change order, promised change order, go. We took that on faith.

Additionally, in **Glascock**, the extra work performed by the contractor was anticipated under the written contract. Gray and Ragland were unaware of the defective plans and specifications for the electrical work designed by Allen & Hoshall until after bidding on the contract. Thus, Gray and Ragland could not have anticipated the extra work they needed to perform for TRA.

¶33. To demonstrate waiver on the part of TRA, Gray cites **Eastline Corp. v. Marion Apartments, Ltd.**, 524 So. 2d 582 (Miss. 1988) and **Sentinel Industry Contracting Corp. v. Kimmins Industry Service Corp.**, 743 So. 2d 954 (Miss. 1999). In **Eastline,** the contractor, Eastline, entered into a construction contract that contained a clause requiring change orders before performance of additional work. **Eastline**, 524 So. 2d at 583. After Eastline encountered multiple problems with the construction plans, it was instructed to undertake extra work to get the project completed. **Id**. at 584. While Eastline requested change orders from the owner for the additional work, it was under pressure to get the job finished and to avoid further delay. **Id**. Thus, Eastline went ahead and did the additional work without first obtaining a change order, because the owner's representatives told Eastline, "Get the project done. Get it done. We'll take care of it later." **Id.** This Court reversed the chancellor and reiterated a long-standing Mississippi principle that "a written contract can be orally

18

modified." *Id*. ("An oral modification may be made even where the contract provides that modification must be in writing.").

¶34. Although it is apparent that the contract between TRA and Gray required a written change order before Gray could obtain compensation for extra work, TRA waived that particular contract provision.

> Among the acts or conduct amounting to waiver are the owner's knowledge of, agreement to, or acquiescence in such extra work, a course of dealing which repeatedly disregards such stipulation, and a promise to pay for extra work, orally requested by the owner and performed in reliance on that promise.

*Eastline*, 524 So. 2d at 584. As demonstrated *supra*, TRA's persistent pattern of conduct of issuing change orders after extra work had begun, Gray's reasonable belief that a final change order would be issued covering all extra work, and Brister's representations (as TRA's agent), taken as a whole, clearly waived the contract provisions requiring a written change order. Since the evidence must be construed in the light most favorable to Gray, and Gray must be given the benefit of all reasonable inferences that can be drawn from the evidence, the jury verdict cannot be set aside on appeal. *White*, 932 So. 2d at 32. The jury verdict is no doubt supported by credible evidence. Thus, this issue is without merit.

### B. Statutory and Common Law Safeguards Pertaining to Public Construction Contracts.

¶35. TRA claims that competitive bidding laws prohibit TRA from paying Gray for changes or modifications to the construction contract because the changes were not "commercially reasonable" as required by Miss. Code Ann. § 31-7-13 (Rev. 2005). Specifically, section 31-7-13 provides, in relevant part:

19

All agencies and governing authorities shall . . . contract for public construction . . . as herein provided.

. . . .

(g) **Construction contract change authorization**. – In the event a determination is made by an agency or governing authority after a construction contract is let that changes or modifications to the original contract are necessary or would better serve the purpose of the agency or the governing authority, such agency or governing authority may, in its discretion, order such changes pertaining to the construction that are necessary under the circumstances without the necessity of further public bids; provided that such change shall be made in a commercially reasonable manner and shall not be made to circumvent the public purchasing statutes. In addition to any other authorized person, the architect or engineer hired by an agency or governing authority with respect to any public construction contract shall have the authority, when granted by an agency or governing authority, to authorize changes or modifications to the original contract without the necessity of prior approval of the agency or governing authority when any such change or modification is less than one percent (1%) of the total contract amount. The agency or governing authority may limit the number, manner or frequency of such emergency changes or modifications.

Miss. Code Ann. § 31-7-13(g) (Rev. 2005).

¶36. On the other hand, Gray argues that TRA cannot claim immunity from liability when TRA authorized the extra work and it was reasonable and necessary for the completion of the Project. Gray asserts that the additional work performed by Gray and Ragland was necessary because Allen & Hoshall's initial plans and specifications for the electrical portion of Component C were defective. Therefore, the cost of performance increased as a direct result of Ragland having to correct the plans and specifications after a three-month delay caused by Allen & Hoshall's unsuccessful attempt to do so. Additionally, the changes to the plans and specifications required more labor, equipment and material than originally was contemplated when Gray prepared its bid.

20

¶37.    To support its position, TRA refers to opinions from the Attorney General.  While the Attorney General's opinions are in no way binding upon this Court, such opinions "may certainly be considered by the Court." *Madison County v. Hopkins*, 857 So. 2d 43, 50 (Miss. 2003) (citing *City of Durant v. Laws Constr. Co.*, 721 So. 2d 598, 604 (Miss. 1998)). TRA cites **1994 Miss. AG Lexis 28** (January 26, 1994), which states in relevant part:

> We have also long held the view that when there has been no official action approving in advance additional work by a contractor, the Board of Supervisors is without authority to make payment for that additional work. We stand by that statement today.  However, for clarification purposes, we hold today that reasonable variations from estimated quantities in the unit price contract setting, do not constitute "additional work" or a change in the terms of the contract. . . .
>
> . . . .
>
> Of course, where the plans and specifications of the original contract are modified or the scope of the work changed, the governing authority must approve a Change Order prior to the additional work being done.  Otherwise, payment for the additional work cannot be authorized.

However, in a later Attorney General opinion, which cites *Baker*, and specifically addresses Miss. Code Ann. § 31-13-7(g), the opinion concluded:

> As a general proposition, when there has been no official action approving in advance additional work by a contractor, a governing authority is not permitted to pay for the additional work.  However, if a contract is to be performed and paid upon a "unit price," a governing authority may find, consistent with fact, and encompass such findings in an order spread upon its minutes, that a proposed change order is necessary or incidental to the completion of the work as originally bid, is commercially reasonable, is not made to circumvent the public purchasing statutes, and that the increase in costs is reasonable, that therefore approve the change order even after the work has been performed.

**1994 Miss. AG Lexis 130** (April 9, 1999).  Thus, while *Baker* stands for two pertinent points:  (1) variations from the unit price are not considered "additional work;" and (2) where

there has been no official action approving in advance additional work by a contractor, a governing authority is not permitted to pay for the additional work; **Honea** further expands the second point by permitting payment for additional work when such additional work is necessary or incidental to the completion of the project, commercially reasonable, not made to circumvent the public purchasing statutes, and the increase in costs is reasonable.

¶38.    Clearly, some of the additional work performed by Gray and Ragland is a direct result of the defective plans submitted by Allen & Hoshall.  Ragland was required entirely to redraw and reconfigure the plans and specifications for the electrical portion of Component C.  Not only did unit quantities increase, but so did labor costs, equipment costs, and overhead costs submitted by Gray and Ragland.  The additional work being claimed by Gray and Ragland, at least in part, was necessary to the completion of the project, commercially reasonable, and not intended to circumvent the public purchasing statutes, and the increases in costs were reasonable.  The additional portion of the claim submitted by Gray and Ragland is for adjustments to the quantity of the materials.

¶39.    Next, TRA cites **Farrish Gravel Co. v. Mississippi State Highway Commission**, 458 So. 2d 1066 (Miss. 1984), where we denied a contractor damages for the increased cost of petroleum products after the contract was due to expire.  **Id**.  This Court held:

> When the State opens a project for bids, a contractor decides what the project is worth.  If he cannot make money on it, he does not have to bid on it and good business judgment would dictate that he not enter a bid.
> . . . .
> While sympathy may be extended to the contractors who lost large sums of money in failing to perform those contracts, the blame must fall upon them. Apparently before submitting their bids neither these contractors nor any other

22

contractors contacted or approached the Commission about modifying the restrictive provision. Only after the contracts had overrun and the contractors had incurred losses did they approach the Commission for help. The time was too late. Action should have been taken before the bids were submitted.

*Id*. at 1070. TRA contends that Gray's failure to provide Ragland with complete materials for the bid, including the plans and specifications for Component A and B, not just Component C, caused Gray and Ragland to underbid the contract; therefore, Gray cannot redirect blame for its failure to properly bid on the project. However, Component C, which was given to Ragland and on which Ragland placed a bid, was completely defective and was the cause of most of the equitable adjustment claim. While Gray did not receive a change order to correct all of the extra work performed by Gray and Ragland regarding Component C, Gray did make TRA aware of the complications. Gray did not wait until the project had overrun before approaching TRA for change orders. Therefore, for the reasons stated, we find this issue to be without merit.

### C.    *Extra-Contractual Damages.*

¶40.    TRA also alleges that the circuit court erred in denying TRA's motion for directed verdict by allowing the jury to consider Gray's claim for delay damages. At trial, Gray sought compensation for eighty-nine days of delay due to the errors and/or omissions to the plans and specifications of Component C. The delay period extended from December 6, 2000, until April 5, 2001. Therefore, part of the delay arguably was covered by change order number 1, which was issued on March 2, 2001. TRA refers to Paragraph 11.9 of the

contract, which is basically a no-damage-for-delay provision, to claim that Gray was not entitled to recover delay damages.

¶41. Gray contends that, although part of the delay damage sought occurred before change order number 1, none of the change orders issued by TRA included payment for time delays and covered only corrections in quantity changes. In addition, Gray argues that change order number 1 was issued before all the delay damages were incurred and corrections to the plans and specifications were completed, and these additional changes were not addressed in change order number 2 or number 3 because change order number 1 was the only change order which dealt with the electrical portion of the Project. Therefore, Gray asserts that the trial court was correct in denying TRA's motion for directed verdict.

¶42. The no-damage-for-delay clause contained in the contract between TRA and Gray states:

> 11.9 Claims For Delay Due To Change: No claim for delay damages will be allowed the Contractor on account of change orders executed by him. In support of this stipulation the following language will be set out on the face of each change order:
>
>> "It is further understood and agreed that this modification constitutes payment in full on behalf of the Contractor and its Subcontractors and suppliers for all costs and markups directly or indirectly attributable to the change order herein, for all delays related thereto, and for performance of the changes within the time frame stated."

All three change orders issued for the project in question contained the above language that the change order constituted payment in full for any delays related thereto.

¶43. We previously have held that "[c]ontractual no-damage-for-delay clauses are enforceable, though they are construed strictly against those who seek their benefit." *Miss. Transp. Comm'n v. SCI, Inc.*, 717 So. 2d 332, 338 (Miss. 1998). However, Mississippi law now recognizes four exceptions to enforcing a no-damage-for-delay clause. Prior to our decision in *SCI*, this Court had only once addressed and upheld the validity of a no-damage-for-delay provision contained within a construction contract. *Id.* (citing *Edward E. Morgan Co. v. State Highway Comm'n*, 212 Miss. 504, 54 So. 2d 742 (1951)). However, in *SCI*, we acknowledged that other jurisdictions had found that "damages may be recovered for any delay that: (1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (3) has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; or (4) is not within the specifically enumerated delays to which the clause applies." *Id.* (citing *Green Int'l, Inc. v. Solis*, 951 S.W. 2d 384, 387 (Tex. 1997); *United States v. Metric Constructors, Inc.,* 480 S.E. 2d 447, 448 (S.C. 1997); *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E. 2d 1215, 1221 (Ill. 1994)). In *SCI*, this Court found that "[t]he Commission's refusal to grant extensions on a timely basis can reasonably be interpreted as active interference or bad faith and would justify a damages award," and that "[t]herefore, the 'no damages for delay' provision does not preclude a damages award in this case." *Id.* at 339.

¶44. Gray argues that the delay damages claimed by it do not arise from change order number 1. Gray claims that its delay damages are premised on deficiencies in the plans and

specifications, TRA's failure to timely resolve the deficiencies, and ongoing changes throughout the Project for which TRA's agent, Brister, promised Gray a final change order. Gray asserts that since TRA never issued a final change order, Paragraph 11.9 has no application.

¶45.    Furthermore, Gray contends that even if paragraph 11.9 does apply, at least three of the exceptions to enforcing a no-damage-for-delay provision in a contract under Mississippi law are applicable in today's case.  Specifically, Gray argues that the delay in construction due to the defective plans provided by TRA was not intended nor could the parties have contemplated that such a delay would result; that TRA made a misrepresentation when Brister repeatedly promised that a final change order would be issued to cover the extra work; and that its damages were not within the specifically enumerated delays.

¶46.    Since determining whether an exception applies is clearly a fact question for the jury, the circuit court was correct in denying TRA's motion for directed verdict. We conclude that the circuit court did not err in refusing to grant a directed verdict as to delay damages; therefore this issue is without merit.

### D.    *Indemnification.*

¶47.    TRA contends that the trial court erred in denying its directed verdict as to Gray's claim for indemnification.  Under well-settled Mississippi law, the obligation to indemnify may arise in three different instances: "a contractual relation, from an implied contractual relation, or out of liability imposed by law." ***Bush v. City of Laurel***, 215 So. 2d 256, 259 (Miss. 1968).  Additionally, "[w]hen one person is required to pay money which another

26

person in all fairness should pay, then the former may recover indemnity from the latter in the amount which he paid, provided the person making the payment has not conducted himself in a wrongful manner so as to bar his recovery." *Id*. at 259-60. Since both parties agree that Gray's claim for indemnification arises out of an implied contractual relationship between Gray and TRA, we note that we previously have stated that two prerequisites of noncontractual implied indemnity must be met: "(1) [t]he damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong." *Hartford Casualty Ins. Co. v. Halliburton Co.*, 826 So. 2d 1206, 1216 (Miss. 2001) (citing *Home Ins. Co. v. Atlas Tank Mfg. Co.*, 230 So. 2d 549, 551 (Miss. 1970)).

¶48. Thus, TRA first contends that Gray has failed to provide any proof that it (Gray) was under a "legal obligation" to pay Ragland since, at the time of trial, there had been no verdict or judgment forcing such payment. However, the circuit court noted that because of the various claims asserted, it would be proper to deny the motion for directed verdict and allow the jury to consider all the issues at the same time. In effect, Gray had put on sufficient evidence to show that as a result of its contract with TRA, Gray sub-contracted with Ragland. As a result, Ragland had no direct contractual relationship with TRA and could get paid only through Gray.

¶49. Next, TRA asserts that Gray failed to meet the second prerequisite of showing that Gray did not actively or affirmatively participate in the wrong. TRA asserts that the proof offered at trial showed that Gray: delayed Ragland by failing to properly coordinate the

27

work with other subcontractors; failed to provide Ragland with all the needed documentation regarding Component A and B of the project; failed to secure a written change order from TRA to cover the alleged extra work incurred by Ragland; and failed to handle Ragland's payroll properly.

¶50. On the other hand, Gray contends that it did not actively participate in the wrongdoing which caused damages to Ragland. Gray contends that the damages asserted by Ragland are a direct result of the defective plans and specifications drawn by Allen & Hoshall for Component C. Gray asserts that it was neither directly nor indirectly responsible for the errors or omissions in the plans and specifications. Therefore, Gray asserts that TRA is solely responsible for any problems which caused the increase in the costs which Ragland claimed against Gray.

¶51. Since we are to consider the evidence in the light most favorable to Gray and give Gray the benefit of all favorable inferences that reasonably may be drawn from the evidence, we cannot say that the circuit court erred by denying TRA's motion for directed verdict on the issue of indemnification. *White*, 932 So. 2d at 32. Gray and TRA have different theories as to who is responsible for Ragland's damages; thus, the evidence the jury heard was of such quality and weight that reasonable and fair-minded jurors could have reached different conclusions. *Id*. Therefore, the trial court properly denied TRA's motion for directed verdict regarding Gray's claim for indemnification. Accordingly, we find this issue to have no merit.

## II. GRAY'S MOTION FOR ADDITUR.

28

¶52.   Gray raises only one issue in its cross-appeal as to TRA: Whether Gray is entitled to an additur, since there is no justification for the discrepancy between the jury verdicts against TRA and Gray.  Gray contends the circuit court erred in not granting an additur as to Gray's judgment against TRA.  However, Gray fails to cite any authority which demonstrates to this Court that it is entitled to an additur.  Failure to cite any authority in support of claims of error precludes this Court from considering the specific claim on appeal. *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994); *Matter of Estate of Mason v. Fort*, 616 So. 2d 322, 327 (Miss. 1993) (citing *R.C. Petroleum, Inc. v. Hernandez*, 555 So. 2d 1017, 1023  (Miss. 1990)); *Kelly v. State*, 553 So. 2d 517, 521 (Miss.1989) (citing  *Brown v. State*, 534 So. 2d 1019, 1023 (Miss. 1988), *cert. denied*,  490 U.S.  1007, 109 S. Ct. 1643, 104 L. Ed.2d 158 (1989),  *Shive v. State*, 507 So. 2d 898  (Miss. 1987), and  *Pate v. State*, 419 So. 2d 1324 (Miss. 1982)). *See also Turner v. Turner*, 612 So. 2d 1141, 1143 (Miss. 1993); *Dew v. Langford*, 666 So. 2d 739, 746 (Miss. 1995).  We thus choose not to address the merits of this issue.

### III.   GRAY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT (RAGLAND).

¶53.   Since the circuit court denied Gray's motion for a judgment notwithstanding the verdict (JNOV), Gray asserts several reasons in its cross-appeal as to Ragland, why it believes that the circuit court erred in not granting its motion.  A motion for JNOV has the same standard of review as a motion for directed verdict.  Therefore, for us to reverse the circuit court's denial of a motion for JNOV, we must find when considering the evidence in the light most favorable to Ragland and giving Ragland the benefit of all the favorable

29

interferences that may be reasonably drawn from the evidence, that reasonable jurors could not have arrived at a contrary verdict. *White*, 932 So. 2d at 32. That is, we must find that reasonable jurors could find only for Gray. However, "if there is substantial evidence in support of the verdict . . . evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required." *Id.*

### A. Quantum Meruit.

¶54. As to the first issue in its cross-appeal against Ragland, Gray argues that the trial court erred in denying Gray's motion for a JNOV on Ragland's *quantum meruit* claim. Particularly, Gray asserts that Ragland sought recovery under both an express contract theory and a *quantum meruit* theory. Gray contends that the claims are mutually exclusive.

¶55. However, Ragland claims that both theories of recovery are applicable in today's case. Ragland claims that under his express contract theory, Gray is obligated to Ragland for the remaining balance on its oral contract. With regard to the *quantum meruit* claim, Ragland claims that Gray owes Ragland for extra work that was outside the terms contemplated by the oral contract.

¶56. "Quantum meruit recovery is a contract remedy which may be premised either on **express or 'implied' contract**, and a prerequisite to establishing grounds for quantum meruit recovery is claimant's reasonable expectation of compensation." *In Re Estate of Fitzner*, 881 So. 2d 164, 173 (Miss. 2003) (emphasis added) (citing *Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987); *Estate of Van Ryan v. McMurtray*, 505 So. 2d 1015 (Miss.

1987); ***Wiltz v. Huff***, 264 So. 2d 808, 810-11 (Miss. 1972)).  The essential elements of recovery under a *quantum meruit* claim are:  "(1) valuable services were rendered or materials furnished;  (2) for the person sought to be charged;  (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him;  and (4) under such circumstances as reasonably notified person sought to be charged that plaintiff, in performing such services, was expected to be paid by person sought to be charged." ***Id***. at 173-74 (citing ***Reed v. Weathers Refrigeration & Air Conditioning, Inc.***, 759 So. 2d 521, 525 (Miss. Ct. App. 2000).

¶57.    Therefore, the doctrine of *quantum meruit* is applicable in today's case, if the jury reasonably believed that Ragland performed additional work not contemplated by its oral contract with Gray, and that Gray accepted Ragland's services and understood that Ragland desired to be compensated for said services.  As discussed *infra*, Ragland performed additional work at Gray's command which was not contemplated by the contract, and Ragland is pursuing its claim for *quantum meruit* to recover for those services.

¶58.    In fact, Gray admitted Ragland performed additional work not contemplated by the contract in a letter issued by Mr. Kelly, Gray's attorney, to TRA.  The letter to TRA outlined all of the various services which Ragland performed that had not been compensated by Gray. Gray was seeking an equitable adjustment from TRA in order to pay Ragland and other subcontractors.

¶59.    Additionally, in ***Glascock***, we stated that in order for a party to recover under a theory of *quantum meruit*, "an award . . . would require a finding by the court that the labor was not

31

anticipated by the contract, and also that there were no provisions of the contract by which payment could be made for unanticipated labor." **Glascock**, 243 So. 2d at 70. That is exactly what Ragland asserts today. While Ragland and Gray did have an oral contract, the contract did not contemplate all of the extra work performed by Ragland. The oral contract also did not contain a provision through which Ragland could request compensation for extra work not anticipated by the contract. Thus, Ragland's only form of recovery is based on *quantum meruit* for services which were performed outside the original, oral contract. Since it was reasonable for the jury to determine that Gray should be liable to Ragland under a legal theory of *quantum meruit*, the circuit court did not err in denying Gray's motion for JNOV on the issue of whether Ragland was entitled to bring such a claim. We thus find this issue to be without merit.

### B.      Damages Proved By Reasonable Certainty.

¶60.    Next, Gray asserts that Ragland failed to prove its damages under the theory of *quantum meruit* with reasonable certainty. In essence, Gray claims that Ragland's proof of damages was speculative and not supported by credible evidence.

¶61.    To support its proposition, Gray cites **Propellex Corp. v. Brownlee**, 342 F.3d 1335, 1339 (Fed. Cir. 2003),[8] which held:

> Before a contractor can obtain the benefit of the total cost method, it must prove: (1) the impracticability of proving its actual losses directly; (2) the

---

[8]In **Propellex**, a contractor sought review of a final decision of the Armed Services Board of Contract Appeals concerning two contracts the contractor had with the Department of the Army.

32

reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs.

*Id.* at 1339 (citing ***Servidone Constr. Corp. v. United States***, 931 F. 2d 860, 862 (Fed. Cir. 1991)). The Court in ***Propellex*** also stated:

Where it is impractical for a contractor to prove its actual costs because it failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its failure to keep the records, the total cost method of recovery is not available to the contractor.

*Id*. at 1342. Thus, Gray's argument that Ragland did not meet its burden of proof regarding the total cost method is inapplicable. Ragland testified that the company did not keep accurate records regarding payroll; therefore, while Gray is correct that Ragland does not have sufficient evidence to prove the amount of damages Ragland is claiming by using the total cost method, Ragland is not necessarily barred from recovery.

¶62.   That being said, Ragland, as the plaintiff, "still carries the burden of proving the amount of any damages with reasonable certainty." ***Adams v. U.S. Homecrafters, Inc.***, 744 So. 2d 736, 740 (Miss. 1999). In ***Adams***, this Court also stated:

Whatever the measure of damages, they may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty. . . . This principle is of importance today, as we remember that a measure of speculation and conjecture attends even damage proof all would agree reasonably certain.

*Id.* at 740 (quoting ***Wall v. Swilley***, 562 So. 2d 1252, 1256 (Miss. 1990)). Thus, while it is true that Ragland must prove its amount of damages with reasonable certainty, Ragland:

should not be deprived of its right to recover because of its inability to prove with absolute certainty the extent of the loss or the exact amount of money

33

unjustly and illegally collected, and the law does not require such absolute accuracy of proof. . . . "The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery."

*Adams*, 744 So. 2d at 740 (quoting ***Billups Petroleum Co. v. Hardin's Bakeries Corp.***, 217 Miss. 24, 37, 63 So. 2d 543, 548 (1953)).

¶63.   Ragland claims that it demonstrated with reasonable certainty that it was entitled to damages. Therefore, "unless the evidence is so speculative that no reasonable juror could find more than nominal damages," the trial court may not direct a verdict against the plaintiff. *Wall,* 562 So. 2d at 1256. The *Wall* Court concluded that as long as a hypothetical, reasonable jury could conclude on the evidence presented at trial that the plaintiff is entitled to more than a nominal damage verdict, we must affirm the circuit court. *Id*. at 1257.

¶64.   While Gray asserts that Ragland failed to offer sufficient evidence to take its damages claim out of mere speculation and conjecture into reasonable certainty, it is important to note the lack of dispute as to the existence of substantial damage. In fact, Gray admitted in its letter to TRA, written by Mr. Kelly on March 1, 2002, that Ragland was owed at least $458,178 for an equitable adjustment. The letter went further to prove Ragland's damages by stating, "Ragland [was] forced to perform design work for which [it was] not paid. . . . Without a time extension for the extensive electrical delays . . . Ragland had no choice but to accelerate the work in an attempt to meet the original schedule. This caused the work to be less efficient and much more expensive than it would have been if the work could have been completed with the full contract time, without delays due to defective designs."

34

¶65. Ragland put on further proof at trial that it performed extensive engineering services by re-drawing the plans and specifications for Component C because Allen & Hoshall's plans and specifications were defective. Ragland testified that Gray had represented to Ragland that it had a greenfield before starting to dig trenches, only to discover that Gray's previous sub-contractors had laid numerous pipes underground around which Ragland had to dig, resulting in more work. Gray agreed that pipes were in place throughout the site. It is also important to point out that Gray never objected at trial to Ragland's damage calculations nor did Gray put on proof of its own to dispute Ragland's claims. Thus, it is probable that a hypothetical reasonable juror, hearing all the testimony at trial, could conclude that Ragland proved its damage claim. We thus find this issue to be without merit.

### C.    Overwhelming Weight of The Evidence.

¶66. Gray next claims that the jury's verdict was against the overwhelming weight of the evidence and evinces passion and bias. However, Gray again fails to cite authority. Just as in its additur claim above, failure to cite any authority in support of claims of error precludes this Court from considering the specific claim on appeal. *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994); *Matter of Estate of Mason v. Fort*, 616 So. 2d 322, 327 (Miss. 1993) (citing *R.C. Petroleum, Inc. v. Hernandez*, 555 So. 2d 1017, 1023 (Miss. 1990)); *Kelly v. State*, 553 So. 2d 517, 521 (Miss.1989) (citing *Brown v. State*, 534 So. 2d 1019, 1023 (Miss. 1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989), *Shive v. State*, 507 So. 2d 898 (Miss. 1987), and *Pate v. State*, 419 So. 2d 1324 (Miss. 1982)). *See also Turner*

*v. Turner*, 612 So. 2d 1141, 1143 (Miss. 1993); *Dew v. Langford*, 666 So. 2d 739, 746 (Miss. 1995). For these reasons, we decline to address the merits of this issue.

### D. Attorneys' Fees Based Upon a Quantum Meruit Claim.

¶67. On January 12, 2006, the circuit court entered its Amended Final Judgment which increased Ragland's judgment against Gray to $1,216,605.20, for which Gray and Hartford were jointly and severally liable as to $892,676. Regarding the circuit court's increase of $366,053.88, the sum of $340,220.53 represented the circuit court's assessment of attorneys' fees against Gray and Hartford and in favor of Ragland. However, Gray contends that if the circuit court's judgment based on the theory of *quantum meruit* should stand, as we have previously determined that it must, the award of attorneys' fees to Ragland must be reversed.

¶68. In essence, Gray correctly argues that unless provided by statute or contract, or unless punitive damages are awarded, attorneys' fees may not be recovered. *Miss. Power & Light Co. v. Cook,* 832 So. 2d 474, 486 (Miss. 2002) (citing *Aetna Cas. & Sur. Co. v. Steele*, 373 So. 2d 797, 801 (Miss. 1979)). On the other hand, Ragland asserts that there are indeed two relevant statutes which authorize the assessment of attorneys' fees in today's case, namely, the Mississippi Litigation Accountability Act of 1988 (Miss. Code Ann. §§ 11-55-1, et seq. (Rev. 2002)); and our construction claim statute (Miss. Code Ann. § 31-5-57 (Rev. 2005)).

¶69. Of significant import is that in the trial court's separate order of January 12, 2006, addressing various issues, including the issue of whether to assess attorneys' fees in favor of Ragland and against Gray, the trial judge stated, *inter alia*, that "[t]he facts surrounding and concerning that portion of Ragland's Motion for Assessment of Attorney's Fees,

36

Prejudgment Interest and Penalty *related to setting the amount of attorney's fees justify*, as to both Gray and Hartford, *an assessment of an attorney's fee* of forty percent (40%) of the principal amount of the November 2, 2005 Judgment as amended which amount the Court found to be reasonable and fair and which satisfied the requirements of law." (Emphasis added). So in essence, the trial judge incorporated into his order by reference the allegations contained in Ragland's motion relating to the issue of whether to award attorneys' fees, and if so, in what amount. By incorporating these allegations contained in this motion into his order as a basis for justifying an award of attorneys' fees, the trial judge obviously believed the allegations to be true, inasmuch as by this time, the trial judge had before him the extensive evidence offered during the course of the two-week trial. With this in mind, we deem it critical here to reveal a summary of the allegations that were in Ragland's Motion for Assessment of Attorney's Fees, Prejudgment Interest and Penalty, as the motion relates to the issue of attorneys' fees. On this issue, the motion referred to the aforementioned Mississippi Litigation Accountability Act and the construction claim statute. The motion also set out a detailed history of this case concerning, *inter alia*, Hartford's alleged bad faith in dealing with Ragland; Gray's actions which were detrimental to Ragland; Gray's acknowledgment, through the trial testimony of Renee Gray, that Gray did not know of any reason why Hartford had not paid Ragland's claim; that Gray "sponsored" Ragland's claim of $458,178; that Ragland received no compensation for the extensive delays caused by the defective plans; that Gray and Hartford persisted in refusing to pay Ragland; that during the trial, Gray never denied that it was indebted to Ragland; that during the trial, Hartford

37

acknowledged that it was liable to Ragland to the same extent that Gray was liable to Ragland; that Gray misrepresented to Ragland the amount that it paid for Ragland's concrete; that Gray solicited Ragland's assistance in persuading TRA to release the retainage with full knowledge by Gray that Ragland would not receive any of the retainage; and, that Gray waited more than four years to pay Ragland the principal amount owed on 320 cy of sand, without considering any accrued interest. Finally, the motion alleged that "[a]s a consequence of the above, the defendants are liable for the payment of Ragland's reasonable attorney's fees. The defendants had no regard for and violated Mississippi's public policy by forcing Ragland to file and prosecute this lawsuit. Their conduct greatly extended the life of this litigation and exaggerated the issues and extended the time in trial while Ragland proved that which the defendants knew to be the facts as evidenced by their utter failure to dispute the testimony!"

¶70. Our standard of review concerning the issue of attorneys' fees is abuse of discretion. **Bailey v. Estate of Kemp**, 955 So. 2d 777, 787 (Miss. 2007) (quoting **Miss. Power & Light Co. v. Cook**, 832 So. 2d 474, 486 (Miss. 2002)). Pursuant to Miss. Code Ann. § 11-55-5 (Rev. 2002), "any court of record in this state . . . shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court . . . finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification."[9] Miss. Code Ann. §

---

[9]Pursuant to Miss. Code Ann. § 11-55-3(b), the word person "means any individual, corporation, company, association, firm, partnership, society, joint stock company or any

31-5-57 (Rev. 2005), further reiterates the same public policy principles in public works contracts by stating:

> Whenever any person supplying labor or material in the prosecution of the work brings an action on such payment bond and the trial judge finds that the defense raised to such action by the contractor or surety was not reasonable, or not in good faith, or merely for the purpose of delaying payment, then the trial judge may, in his discretion, award the claimant a reasonable amount to be determined by the trial judge as claimant's attorney's fees in bringing such successful action.

*Id.*

¶71.  Based on these two statutes and our case law, we find from the record before us that the circuit court did not abuse its discretion in awarding attorneys' fees to Ragland and against Gray and Hartford. *See* *In Re Estate of Ladner*, 909 So. 2d 1051, 1055-56 (Miss. 2004) (chancellor's award of attorneys' fees justified under Litigation Accountability Act and Miss. R. Civ. P. 11); *Key Constructors, Inc., v. H & M Gas Co.*, 537 So. 2d 1318, 1324-25 (Miss. 1989) (Miss. Code Ann. § 31-5-57 provides for award of reasonable attorneys' fees upon the furnishing of an evidentiary predicate therefor). Gray delayed paying Ragland the remaining balance on its contract for no apparent reason. Gray knew that Ragland was entitled to the money, but withheld the money and has continued to do so. Further, Gray solicited and secured Ragland's efforts to persuade TRA to release the retainage, inducing

---

other entity, including any governmental entity or unincorporated association of persons." Likewise, pursuant to section 11-55-3(a), the phrase "without substantial justification," for the purpose of this statute and "when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that it is frivolous, groundless in fact or in law, or vexatious, as determined by the court."

Ragland to believe that it would get its money when in fact Gray had already assigned the entire retainage to its bank.

¶72. Additionally, Gray sought an equitable adjustment from TRA before trial in which it admitted that Ragland was due $458,158 for additional work. However, it refused to pay Ragland this additional money "without substantial justification." In fact, in Gray's Third Party Complaint, Gray requested payment from TRA for an amount which included Ragland's $458,178.

¶73. In sum, for the reasons stated, we find that the trial court did not abuse its discretion in assessing attorneys' fees in favor of Ragland and against Gray; therefore, this issue is without merit.

### E. Excessive Attorneys' Fees.

¶74. Next, Gray asserts that the amount of attorneys' fees awarded by the trial court was set without any meaningful analysis; thus, the fees were not supported by findings of fact. Therefore, even though we have found that the trial court appropriately assessed attorneys' fees in favor of Ragland and against Gray, we still must determine if the amount of attorneys' fees awarded was excessive.

¶75. Again, as stated, *supra*, the trial judge in essence incorporated into his order by reference the allegations contained in Ragland's motion relating to the issue of whether to award attorneys' fees, and if so, in what amount. Also, we again state that the trial judge likewise had the benefit of the extensive evidence offered during the course of the two-week trial. Additionally, attached to Ragland's Motion for Assessment of Attorney's Fees,

40

Prejudgment Interest and Penalty was the sworn affidavit of Ragland's attorney, Thomas W. Prewitt. The affidavit detailed, *inter alia*, that Prewitt was employed by Ragland to prosecute Ragland's claim against Hartford and Gray in May of 2002. While Prewitt and Ragland did not have a written employment contract, Ragland and Prewitt agreed to a forty-percent contingent fee arrangement.

¶76. At the time the affidavit was prepared, Prewitt, a sole practitioner, had been engaged in the active practice of law for more than forty-five years, and for more than forty years of that time, he had concentrated on the resolution of disputes in the construction industry. Prewitt's normal hourly rate at the time Ragland employed Prewitt was $225. However, shortly after being employed by Ragland, Prewitt's hourly rate increased to $250. That being said, Prewitt's affidavit stated that $250 was a rate customarily charged by competent attorneys for this type of work in this geographic area. Based on Prewitt's hourly rate and the hourly rate of his legal assistants, Prewitt stated that he would have billed Ragland in excess of $300,000 for his legal services.[10] In his sworn affidavit, Prewitt also stated that for the four weeks prior to the trial of this case, he averaged more than ten hours per day working on this one case, and that during the twelve days immediately prior to the commencement of the trial, he devoted eighteen hours per day working on this case. As of the execution of

---

[10]Attached to Prewitt's affidavit are forty-three pages of detailed time reports detailing the dates, hours, hourly rate, description of services rendered, and by whom rendered. These time reports reveal a total charge of $172,326; however, in his affidavit, Prewitt explains this discrepancy ($172,326 vs. "over $300,000") by stating that as of the middle of June 2005, he and his staff became totally focused on preparation for the late-July trial, thus preventing accurate record keeping after the middle of June.

41

the affidavit, Prewitt had received no attorneys' fees in this case, although Ragland had reimbursed Prewitt for some of his expenses.

¶77.    Furthermore, Prewitt's affidavit stated:

> I am familiar with the *McKee* factors and the requirements of Canon 1.5 of the Code of Professional Responsibility related to attorney's fees and have taken those into account in reaching the figure requested in this Affidavit. I am familiar with and have previously applied the factors identified in *In Re [Estate] of Alexander Taylor Gillies, Jr.*, 830 So. 2d 640 (Miss. 2002) and have taken them into account when arriving at the request contained in this Affidavit.

Additionally, we note that Prewitt requested attorneys' fees in the amount of $411,488.84; however, the trial court awarded attorneys' fees in the amount of $340,220.53, which amount was more than $71,000 less than the amount requested by Prewitt and Ragland.

¶78.    Sections 11-55-5 and 31-5-57 both require that an assessment of attorneys' fees must be in an amount deemed to be reasonable. We must start our analysis of this issue with the United States Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), in which the Supreme Court adopted the "lodestar" method of calculating reasonable attorneys' fees. The Court stated the amount of attorneys' fees understandably had to be determined based on the facts of each case. *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937. The Court likewise set out the twelve factors to be considered in determining a reasonable attorneys' fee to be awarded: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by

42

the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at 1938 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714, 717-719 (5th Cir. 1974)).

¶79. Rule 1.5 of the Mississippi Rules of Professional Conduct sets out several factors which the trial court should consider in determining the reasonableness of the amount of attorneys' fees. Other than a minor rewording and reordering, these factors are virtually identical to the factors set out by the United States Supreme Court in *Hensley*. The Mississippi factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Miss. R. Prof. Conduct 1.5(a). A close reading of our Mississippi factors reveals that the only *Hensley* factor which is not included in Rule 1.5, in some shape, form or fashion, is "the 'undesirability' of the case."

¶80.    In *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982), this Court stated that factors to be considered in an award of attorneys' fees included "the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case." *Id.* at 767. The *McKee* factors are strikingly similar to the factors set out in Miss. R. Prof. Conduct 1.5(a).

¶81.    We have stated that "[t]he trial court is the appropriate entity to award attorneys' fees and costs." *Mabus v. Mabus*, 910 So. 2d 486, 488 (Miss. 2005) (citing *Cook*, 832 So. 2d at 478). Therefore, a trial court's decision regarding attorneys' fees will not be disturbed by an appellate court unless it is manifestly wrong. *Mabus*, 910 So. 2d at 488. "The word 'manifest,' as defined in this context, means 'unmistakable, clear, plain, or indisputable.'" *Id*. (quoting *Mosley v. Atterberry*, 819 So. 2d 1268, 1272 (Miss. 2002)). The controlling factor is "what is reasonable." *BellSouth Pers. Commun., LLC v. Bd. of Supervisors*, 912 So. 2d 436, 446 (Miss. 2005) (quoting *Mauck v. Columbus Hotel*, 741 So. 2d 259, 271 (Miss. 1999)). Unless we determine that the trial judge in today's case abused his discretion

44

in the amount of attorneys' fees assessed, we are duty-bound to affirm.  *Mabus*, 910 So. 2d

at 488.

¶82.    In *BellSouth*, we stated:

> The United States Supreme Court adopted the "lodestar" method of calculating
> reasonable attorney fees.  In calculating the "lodestar" fee, the **most useful
> starting point for determining the amount of a reasonable fee is the
> number of hours reasonably expended on the litigation, multiplied by a
> reasonable hourly rate**.  This calculation provides an objective basis on
> which to make an initial estimate of the value of a lawyer's services. . . .

*BellSouth*, 912 So. 2d at 446-47 (quoting *In re Estate of Gillies*, 830 So. 2d 640, 645 (Miss.

2002)).  Therefore, a trial court's award of attorneys' fees will be on course for probable

affirmance on appeal if the trial judge used as a starting point the number of hours reasonably

expended on the litigation, multiplied by a reasonable hourly rate, after which the issue of

attorneys' fees must then be appropriately considered in light of Miss. R. Prof. Conduct

1.5(a) and the *McKee* factors.  *BellSouth*, 912 So. 2d at 447.

¶83.    In today's case, the trial court's order awarding attorneys' fees in favor of Ragland

stated in pertinent part:

> The *facts surrounding and concerning that portion of Ragland's Motion For
> Assessment of Attorney's Fees,* Prejudgment Interest and Penalty *related to
> setting the amount of attorney's fees justify*, as to both Gray and as to
> Hartford, an assessment of an attorney's fee of forty percent (40%) of the
> principal amount of the November 2, 2005 Judgment as amended *which
> amount the Court found to be reasonable and fair and which satisfied the
> requirements of law*.

(Emphasis added). Again, the language of this order convinces us that the trial judge adopted by reference the assertions of Ragland in his motion, and the assertions of Ragland's attorney in his sworn affidavit attached as an exhibit to Ragland's motion.

¶84. The trial judge determined that a fee of forty percent of the principal amount of the judgment was reasonable; thus, he awarded Ragland forty percent of his judgment against Gray for attorneys' fees, totaling $340,220.53. If the record before us indicated that the trial court made a *carte blanche* assessment of attorneys' fees based on a forty-percent contingency basis, we would unhesitatingly reverse this award and remand for an evidentiary hearing, especially in light of the fact that the oral contract for a contingency fee was between Ragland and Prewitt, a contract to which Gray and Hartford were not parties. After all, the United States Supreme Court in **Hensley** acknowledged that the "American Rule" provides that "each party in a lawsuit ordinarily shall bear its own attorney's fees" absent the existence of certain circumstances, such as statutory authority. **Hensley**, 461 U.S. at 429, 103 S.Ct. at 1937.

¶85. However, on the other hand, the record before us reveals, *inter alia,* that the trial judge presided over a two-week trial in which numerous witnesses testified, and more than one hundred exhibits were received into evidence; that the trial judge had his recall of the evidence including that evidence revealing to the judge and jury the conduct of the participants in the Project. Furthermore, the trial judge had before him Ragland's motion for assessment of attorneys' fees, with the attached sworn affidavit of Ragland's attorney, which motion and/or affidavit referred to Miss. Code Ann. §§ 11-55-5 and 31-5-57; the **McKee**

46

factors; Miss. R. Prof. Conduct 1.5(a); *In Re Estate of Gillies*, 830 So. 2d 640 (Miss. 2002); as well as setting out information relating to the *McKee* factors. We already have acknowledged that these factors are virtually identical to the *Hensley* factors adopted by the United States Supreme Court. The record also shows that the trial judge's amended final judgment, *inter alia*, assessed attorneys' fees by reference to the order entered the same day as the amended final judgment; and that the trial judge entered his order which, *inter alia*, assessed attorneys' fees in favor of Ragland and against Gray and Hartford in the sum of $340,220.53 (albeit based on forty-percent of the principal amount of the judgment), by stating that "the facts surrounding and concerning that portion of Ragland's" motion for attorneys' fees "related to setting the amount of attorney's fees justify" the assessment of the attorneys' fees in an amount which the trial judge "found to be reasonable and fair and which satisfied the requirements of law." We thus find from the totality of the evidence that the amount of attorneys' fees assessed against Gray and Hartford and in favor of Ragland is justified, and the trial judge did not abuse his discretion in assessing attorneys' fees in the amount of $340,220.53. Accordingly, we find this issue to be without merit.

### F.    Remittitur.

¶86.    Gray contends that the trial court should have granted its motion for a new trial on damages or issued a remittitur. To support his proposition, Gray cites *Cade v. Walker*, 771 So. 2d 403, 407 (Miss. Ct. App. 2000) which held that a remittitur may be ordered if either "(1) the jury or trier of fact was influenced by bias, prejudice, or passion; or (2) the damages awarded were contrary to the overwhelming weight of the credible evidence." Since this

47

issue basically is encompassed in Gray's argument that the damages were not proved with reasonable certainty, this issue has been addressed and lacks merit. The trial court did not err in denying Gray's request for a remittitur; therefore, we find this issue to be without merit.

### IV. RAGLAND'S MOTION TO DIRECT THE CLERK TO PAY RAGLAND THE MONEY TRA PAID INTO COURT.

¶87. On December 12, 2005, TRA paid the sum of $260,437.78 into the Lee County Circuit Court's registry to satisfy the entire judgment plus interest in favor of Gray. Thereafter, on December 13, 2005, the trial judge entered an order providing that the judgment against TRA in favor of Gray "is satisfied and canceled." The order further directed that the lien upon all the real, personal or mixed property of TRA should be satisfied and canceled.

¶88. Thereafter, on December 29, 2005, Ragland and Hartford entered into a Full, Final, and Absolute Release and Assignment in which Hartford assigned to Ragland all of its rights in the money TRA paid into the court's registry. Since Gray previously had assigned its rights in the judgment to Hartford, Ragland now obtained all the rights to the money which TRA paid into the court's registry. Thus, Ragland filed a Motion to Require the Circuit Clerk to Pay Ragland the Funds TRA Paid Into Court. On January 6, 2006, TRA opposed Ragland's motion and asked the circuit court to allow TRA's payment of judgment to serve as collateral for a supersedeas bond. On January 17, 2006, the circuit court entered an order denying Ragland's motion to require the circuit clerk to deliver TRA's paid judgment to

48

Ragland and granting TRA's motion to post a supersedeas bond by posting a bond equal to twenty-five percent of the judgment. Once TRA posted a bond equal to 25% of the judgment, the court's registry contained a bond equal to 125% of the judgment against TRA.

¶89.   Ragland contends that TRA's motion opposing the circuit clerk paying Ragland and seeking appeal should have been denied. Essentially, Ragland contends that, once TRA paid its judgment and then made an *ore tenus* motion to have the payment serve to have the judgment satisfied and canceled and the lien from its property removed, TRA had no further claim to the money. According to Ragland, since TRA had no further claim to the money, the money could not serve as security for an appeal.

¶90.   Ragland complains that he suffered disproportionate and irreparable harm because he no longer had the procedural safeguards of a judgment lien against TRA's property. Additionally, Ragland contends that the circuit court did not protect the prevailing party, Ragland. However, Ragland's contentions do not stand muster. M.R.A.P. 8 permits the trial court to grant a stay provided that the interests of the prevailing party are secure.

¶91.   *In re Estate of Taylor*, 539 So. 2d 1029, 1029 (Miss. 1989) was the first Mississippi Supreme Court case to address what is now M.R.A.P. 8 "relating to a stay of judgment pending appeal under a supersedeas bond." In *Taylor*, we stated:

> The procedure by which an unsuccessful litigant seeks a stay of the execution of a judgment appealed from is a supersedeas. The granting of a supersedeas commands the staying of a proceeding at law and prohibits the enforcement of the trial court's judgment pending review. To secure such stay of proceedings, it is necessary that the litigant secure a sufficient bond in the amount set by the trial judge.

49

. . . . the general purpose of the supersedeas bond, []is to effect absolute security to the party affected by the appeal. *In Re Watkins' Estate*, 114 Vt. 109, 41 A. 2d 180 (1944); *Ricci v. Bove's Estate*, 116 Vt. 335, 75 A. 2d 682 (1950). The amount of a supersedeas bond should be sufficient to protect the appellee in his judgment; therefore, it should insure the payment of the judgment and interest, and any waste that could occur pending the appeal. If the appeal is affirmed, the appellee should be able to satisfy the payment of the judgment in full, together with costs, interest, and the damages for delay.

The bond is the typical means of giving the appellee security. However, the Court may approve security in the form of cash or property. The judgment may be secured in other ways such as the Court's taking possession of personal property or otherwise providing for a method to insure payment of the appellee's judgment.

*Id*. at 1031.

¶92. In this case, Ragland's interests are secure, although Ragland contends otherwise. TRA paid into the court's registry one hundred percent of the judgment against it, plus all interest. In addition to one hundred percent of TRA's judgment, TRA paid an additional twenty-five percent of the judgment to serve as a supersedeas bond. Therefore, Ragland is more protected than he would have been if TRA had simply posted a bond of one hundred twenty-five percent, because there is an actual money judgment in the court's registry. Under the Supreme Court guidelines set out in *Taylor*, TRA has satisfied the purpose of posting a supersedeas bond and is entitled to an appeal.

¶93. Next, Ragland cities *Anderson v. T.G. Owen & Son, Inc.*, 231 Miss. 633, 97 So. 2d 369 (Miss. 1957), to support its proposition that satisfaction of a judgment is prima facie evidence that a creditor has received the money. *Id.* at 370. Thus, Ragland contends that the money paid into the court's registry immediately should be payable to it. Ragland is

50

mistaken. Once Ragland obtained an interest in the judgment paid by TRA, Ragland did not have a immediate right to collect that judgment. Ragland, as the prevailing party, merely had a right to have its interest in that judgment protected until the appeal process was complete. M.R.A.P 8.

¶94. Furthermore, Ragland contends that judicial estoppel should preclude TRA from staying the execution of the judgment. Particularly, Ragland cites **Richardson v. Cornes**, 903 So. 2d 51, 56 (Miss. 2005), which stated, "[j]udicial estoppel precludes a party from asserting a position, benefitting from that position, and then, when it becomes more convenient or profitable, retreating from that position later in the litigation." That being said, "a party cannot assume a position at one stage of a proceeding and then take a contrary stand later in the same litigation." *Id.* This is not what TRA did. TRA does not seek to reclaim the money paid into the court's registry. TRA requested that the execution on the judgment be stayed pending the outcome of this appeal. Ragland's assertion that judicial estoppel precludes TRA from staying the execution of the judgment lacks merit.

¶95. In addition, it would be against public policy to punish a judgment debtor for paying a judgment against the judgment debtor by denying the judgment debtor an appeal. Ragland has not suffered disproportionate and irreparable harm because the circuit clerk still possesses the paid judgment. While TRA has no interest in the money, other than requesting that it stay in the court's registry pending the outcome of the appeal, the interests of TRA and Ragland both are protected. The trial judge did not err in denying Ragland's motion and

51

granting TRA's motion to post a supersedeas bond and file an appeal. Therefore, this issue lacks merit.

## CONCLUSION

¶96.    For the reasons stated above , the amended final judgment entered by the Circuit Court of Lee County is affirmed on both direct appeal and cross-appeal.

¶97.    **ON DIRECT APPEAL:  AFFIRMED; ON CROSS-APPEALS:  AFFIRMED**.

**SMITH, C.J., WALLER AND DIAZ, P.JJ., DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  GRAVES, J., CONCURS IN RESULT ONLY.  EASLEY, J., NOT PARTICIPATING.**