ISHEE, J„
for the Court:
¶ 1. In 2000, William Martin (Martin) Falkner and his wife, Valerie J. Falkner (the Falkners), hired John E. Stubbs to build a basement, prior to the Falkners building a log cabin above the basement on their land in Chickasaw County, Mississippi. Stubbs and the Falkners entered into an oral contract for Stubbs to complete the basement for a set fee of approximately $25,000. However, after completing the basement, the Falkners requested that Stubbs continue to work on the log cabin. Stubbs complied and stated the work would cost between $150,000 and $200,000. After the basement was completed and work on building the log cabin had begun, the Falkners instructed Stubbs and his workers to permanently vacate the premises. Stubbs complied and requested payment from the Falkners for the remainder of his expenses, including labor and materials. The Falkners refused, and Stubbs eventually filed a contractor’s lien in Chickasaw County Chancery Court on the Falkners’ property. He later filed the instant action in Chickasaw County Circuit Court seeking reimbursement for his losses. After a bench trial on the matter, the circuit judge ruled Stubbs was entitled to $60,723.53 from the Falkners. Aggrieved, the Falkners appeal. We affirm in part and reverse and remand in part.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Stubbs, a certified public accountant (CPA) by trade, developed an interest in construction at a very young age. He was raised on a farm outside of Ripley, Mississippi, where he helped his father build barns and various other farm buildings through tutelage from Stubbs’s father and grandfather who was a carpenter. When Stubbs became a teenager, he also worked for his uncle who was a general contractor.
¶ 3. Despite Stubbs’s exposure to the field of construction at a very young age, he became a CPA in his adult years but maintained construction work as a hobby. Before retiring from the practice of accounting in 1996, Stubbs discovered Polys-teel, a stay-in-place insulated concrete form which allowed structures to be built of solid concrete reinforced with rebar. In *1045 February 1997, Stubbs attended a Polys-teel training program and later bought his own Polysteel franchise to become an official distributor.
¶ 4. One of his first independent projects with Polysteel was the August 1997 construction of his family’s home — a structure measuring almost 10,000 square feet under the roof, including porches, garages, and living spaces. At the time of at trial, Stubbs and his family had lived in the house for approximately twelve years without any problems. Between the time of his home’s construction and his introduction to the Falkners, Stubbs built many other structures using the Polysteel, including several basements. Stubbs testified his fee schedule included $25 an hour for labor plus the cost of materials.
¶ 5. In 2000, Stubbs was training Mike Bruce in Saltillo, Mississippi, in the use of Polysteel for Bruce’s basement. Bruce and Martin worked together, and Bruce introduced Martin to Stubbs during the construction of Bruce’s basement. Martin discussed with Stubbs and Bruce his plans to build a log cabin for himself and his wife using logs he had collected over the years as a forester. Martin indicated he would like to build a basement under the home and inquired with Stubbs as to the use of Polysteel in the basement. Martin and Stubbs agreed to meet again once Martin finalized the log cabin house plans.
¶ 6. Sometime later, Martin called Stubbs and met him at Stubbs’s office in Ripley, Mississippi. The plans Martin showed Stubbs did not include a basement. However, after reviewing the plans, Stubbs determined a basement could be put in place using Polysteel. After explaining how Polysteel worked, Martin also became interested in using Polysteel in the construction of one partition wall inside the home. Stubbs studied the plans in detail and explained to Martin that log cabins are typically more expensive to build than standard homes. According to Stubbs, he quoted Martin a price between $45 and $75 per square foot based on construction industry standards in the area. Stubbs also claims he advised the Falkners the price would also vary depending on the finishes and fixtures the Falkners chose. Since Martin planned on completing some of the work on the home himself, Stubbs told Martin the approximately^, 000-square-feet home would cost anywhere between $150,000 and $200,000, including the basement. Martin, however, asserts Stubbs quoted him $100,000 for completion of the entire home.
¶ 7. With regard to the basement alone, Stubbs estimated Martin’s cost around $25,000. Stubbs agreed to build the basement for no more than $25,000. Although specifics as to the price and billing were not discussed in detail, Martin hired Stubbs to construct the basement out of Polysteel. Stubbs’s work included construction of the basement floor, perimeter walls, and one interior wall using Polys-teel. Excavation, electrical wiring, and plumbing were to be handled by Martin. Work on the basement began in May 2000.
¶ 8. Stubbs received an up-front payment of $7,000 for costs associated with ordering Polysteel. Thereafter, Stubbs periodically submitted “request draws” from Martin and kept records of his and his two workers’ daily times as well as all invoices. Stubbs’s fee was $25 an hour plus travel costs.
¶ 9. After the basement space had been excavated from the Falkners’ land but pri- or to the pouring of the concrete floor, plumbing had to be completed. Although Martin originally stated his father was a plumber and would handle the basement plumbing, the plumbing was not installed in time to pour the concrete floor. As such, Stubbs installed the basement’s floor *1046 drain and completed plumbing for the basement’s bathroom. He also installed the piping for the basement’s water line.
¶ 10. Other changes to the initial agreement between Martin and Stubbs began to arise. For example, Martin increased the height of the basement, necessitating the purchase and installation of more Polysteel and waterproofing materials. Martin also decided to insert another Polysteel wall on the inside of the basement by the garage, to insulate the wall, and to install french doors on the wall. Martin later requested a wall be removed from the inside of the basement which required the insertion of a steel beam to support the floor above the basement. Martin also asked Stubbs to install the main floor of the home above the basement. These changes along with others made by Martin cost Stubbs extra time and money not initially accounted for in the $25,000 quote.
¶ 11. Work on the basement was completed approximately six weeks after the project began, at which point Stubbs had not been paid the full amount of $25,000. However, Martin asked Stubbs if he would continue assisting him in the completion of the home at the cost of Stubbs’s actual time and material expenses. Throughout the process of building the home, Martin continued to insist he would hire or enlist other workers to finish the home if Stubbs would continue work on it while he did not have other ongoing Polysteel projects. Stubbs agreed to continue helping Martin for an undetermined amount of time for the cost of Stubbs’s time and materials.
¶ 12. Stubbs’s activities in completing the home included, but were not limited to: purchasing materials for the home, furnishing his own equipment, transporting his crewmen to and from the job site, devising a method to notch the ends of the logs to ensure they interlocked properly, helping Martin stack the logs to be used on the home, installing a system which bound the logs together with the use of cables, building the roofs structure, installing decking, completing minor plumbing, completing much of the framing inside the home, and installing sub-floors. Because Martin served as his own general contractor, Stubbs was paid upon his request for a draw. In October 2000, prior to completion of the home, Stubbs requested a draw from Martin, but was denied payment and was told to remove his belongings and vacate the premises. At that time, Stubbs had been paid a total of $45,840.25.
¶ 13. Stubbs left the property as instructed and informed Martin he still owed Stubbs approximately $25,000, which Martin refused to pay. Martin then hired other workmen to finish projects so that Martin and his wife could move into the property in March 2001. As of November 2009, the Falkners were still living in the subject home. Nonetheless, in his refusal to pay Stubbs, Martin asserted Stubbs gave him an estimate of approximately $100,000 to complete the structure and he claims Stubbs had been overpaid by about $5,000 before his work was near completion. Martin argued any more payments to Stubbs would grossly exceed the original estimate of $100,000. However, Stubbs claims he never agreed to complete the home and maintains he told Martin the home would cost at least $150,000 to $200,000 to complete.
¶ 14. Shortly thereafter, Martin borrowed $150,000 using the home as collateral after the home appraised for $177,000, but he still refused to pay Stubbs. Stubbs filed a mechanics and materialman’s lien in the chancery court and later filed a lawsuit in the circuit court on August 29, 2001 against the Falkners to recover his losses. Although the case was set for trial on several occasions, Falkner received multi- *1047 pie continuances before finally agreeing to a bench trial after filing a cross-complaint on June 23, 2009.
¶ 15. The cross-complaint alleged major defects in the home due to Stubbs’s workmanship. However, the Falkners never provided the circuit court with documentation or testimony as to the cost of repair for the alleged defects. At the close of testimony, Stubbs and the Falkners requested the circuit judge inspect the premises to view the alleged deficiencies. The circuit judge complied and later stated: “The allegations in the Cross-Complaint as to unusual cracks or defects were not noted during the inspection.”
¶ 16. Furthermore, the Falkners asserted because Stubbs requested his draws and received his pay without submitting invoices or time sheets, he was not entitled to the money he claimed he was owed. However, the record reflects Stubbs kept detailed accounts of his time, his workers’ time, and all invoices for materials used in the construction of the Falkners’ home. The circuit judge went on to note:
There was no testimony as to how much it cost Falkner to repair any alleged defects; the value of the home when Stubbs was terminated; no evidence nor testimony that Stubbs did not purchase the materials contained in his accounting and that the materials were not used in the construction of the dwellingt;] and no evidence that Stubbs and his workmen did not perform the work contained in Stubbs[’s] detailed daily accounting.
¶ 17. At the close of the trial, the circuit judge ruled in favor of Stubbs. The circuit judge concluded the oral contract between the parties resulted in an agreement for Stubbs to construct the basement at a cost of $25,000 and the Falkners owed Stubbs the remainder of the $25,000. The circuit judge also determined after the basement was completed, Martin requested Stubbs and his workers continue construction on the home. The circuit judge found because of further work on the home, the Falkners owed Stubbs reimbursement for his actual time on the job and his workers’ time on the job on a quantum meruit basis, travel time for himself and his crew, and pre- and post-judgment interest. The circuit judge further stated Stubbs was entitled to reasonable attorney’s fees and all costs in bringing the actions. These costs totaled an award of $60,723.53 to Stubbs.
¶ 18. Aggrieved, the Falkners appeal claiming the circuit judge erred by not reducing the $25,000 price for the basement by the amount of work not completed by Stubbs and failing to consider certain witness testimony. They further assert the circuit judge erred in his quantum meruit analysis as to attorney’s fees to Stubbs.
STANDARD OF REVIEW
¶ 19. We have long held:
On appeal, this Court has a particular standard of review that it must apply when reviewing findings of fact made by a trial judge sitting without a jury. These such findings may not be disturbed or set aside on appeal unless manifestly wrong. In further explanation of this standard, these findings may not be upset here on appeal provided there is in the trial record substantial supporting evidence. It matters not that on the same proof we as trial judges might have found otherwise.... [Furthermore, a] trial judge, sitting as the trier of fact, is solely authorized to determine witness credibility.
Clark v. City of Aberdeen, 764 So.2d 508, 510 (¶ 9) (Miss.Ct.App.2000) (internal citations omitted). As such, while we will review questions of law de novo, we will not upset a trial judge’s findings of fact *1048 determined without a jury unless there is manifest error. Davis v. Countrywide Home Loans, Inc., 72 So.3d 1163, 1165 (¶ 8) (Miss.Ct.App.2011) (citation omitted).
DISCUSSION
I. Reduction of $25,000 and Consideration of Witness Testimony
¶ 20. As stated previously, we will not reverse the circuit judge’s findings of fact if they are substantiated by the record. Broadway Inn Express, LLC v. Advanced Constr. Technologies Ltd., 29 So.3d 104, 108 (¶ 13) (Miss.Ct.App.2010) (quoting Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 238 (Miss.1987)). The Falkners first argue the circuit court erred by failing to reduce the original $25,000 price of the basement by the amount the Falkners claim they have done themselves due to Stubbs’s failure to complete the basement. As noted by the circuit court, the agreement between the Falkners and Stubbs was an oral contract. There is clear evidence in the record the original agreed-upon price for Stubbs’s construction of the basement was $25,000. Stubbs submitted very detailed accounting records including his labor and his workers’ labor broken down into daily hours during the entirety of the project. Stubbs also provided invoices and records of costs paid by Stubbs for the materials used in the home. While the Falkners claim Stubbs failed to complete the basement and the work contained defects, an on-site inspection performed by the circuit judge showed no sign of defects, nor can the Falkners point to costs associated with the repair of the alleged defects. Furthermore, Stubbs documented the progress of the basement project in photographs. The photographs clearly show the constructed basement and document some of the home’s construction on top of the basement as well.
¶ 21. While the Falkners point to Stubbs’s failure to submit the time sheets and invoices prior to the trial, the record reflects the fee agreement between the Falkners and Stubbs did not require Stubbs’s submission of such documents. Given Stubbs’s trade as a CPA, it comes as no surprise he kept daily records of his labor and material expenses. Nonetheless, the record indicates his agreement with the Falkners did not include a request for time and expense invoices until the Falkners refused to pay Stubbs for his work on their home.
¶ 22. According to Stubbs’s records, in the five months he worked on the Falk-ners’ home, he requested and received seven draws totaling $46,540.25. However, his records further indicate his labor and expenses well exceeded that amount due to Martin’s changes to the basement and his enlistment of Stubbs to continue working on the rest of the home.
¶ 23. Additionally, the defects and costs of completion alleged by the Falk-ners are unsubstantiated both in the record and pursuant to the circuit judge’s own examination of the property. Though the Falkners’ arguments on this issue are vague, at best, we assume their argument regards witnesses they produced at trial who testified about cracks and flaws in the home’s construction and the circuit judge’s consideration of the witnesses’ testimony. Having reviewed the trial transcript and the circuit judge’s orders, we cannot say the circuit judge failed to acknowledge the testimony at hand. While several witnesses discussed their observations of cracks in the walls or doors that would not close properly, the circuit judge viewed the property and could not locate the defects alleged. Additionally, it is within the purview of the circuit judge in this case to determine which witnesses to believe. “A trial judge, sitting as the trier of fact, is *1049 solely authorized to determine witness credibility.” Clark, 764 So.2d at 510 (¶ 9) (citation omitted).
¶ 24. As such, we find no error in the circuit judge’s conclusion that the $25,000 price for construction of the basement was agreed upon by the parties and is owed to Stubbs by the Falkners. Furthermore, we cannot say the circuit judge failed to consider the Falkners’ witnesses’ testimony. The mere fact that a judge rules against a party does not automatically mean the judge failed to consider that party’s witnesses. The circuit judge in this case was present for the witnesses’ testimony at trial and acknowledged the Falkners’ claims of defect in his final order and judgment. We find no error in the circuit court’s judgment. These issues are without merit.
II. Quantum Meruit Analysis of Fees
¶ 25. The Falkners assert the circuit judge erred by applying the theory of quantum meruit to determine Stubbs’s recovery for his labor and reimbursement for the amount he paid for his workers’ labor. However, we must note the Falk-ners failed to brief this issue on appeal. Indeed, the Falkners’ entire argument for all issues asserted consists of three pages, contains two citations to the law, and bears no mention of the circuit court’s application of quantum meruit to Stubbs’s and his workers’ fees. The only reference to quantum meruit after the Falkners’ initial statement of the issue at hand was in regard to the circuit court’s award of interest and attorney’s fees to Stubbs.
¶ 26. Mississippi Rule of Appellate Procedure 28(a)(6) states: “The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.” Because the Falkners failed to support or even mention their argument regarding the assessment of fees after defining the issue in the statement of issues, we are not bound to address it. See, e.g., McDonald v. McDonald, 69 So.3d 61, 68 (¶ 16) (Miss.Ct.App.2011) (citing M.R.A.P. 28(a)(6)). Nonetheless, we will analyze the issue briefly.
¶ 27. The circuit judge concluded the Falkners owed Stubbs reasonable fees for his work on the project and reimbursement for his payment to his workers. In doing so, the circuit judge reviewed Stubbs’s quoted price of $25 an hour and construction industry standards in the area. The circuit judge employed a quantum meruit analysis in determining that reasonable fees resulted in $20 an hour for Stubbs and between $7 and $10 an hour for Stubbs’s workers. The circuit judge also concluded Stubbs’s charge for travel time between his office and the job site at one-half his hourly rate was fair and reasonable with the reduced hourly rate of $20.
¶ 28. In his analysis, the circuit judge referenced Tupelo Redevelopment Agency v. Gray Corporation, 972 So.2d 495 (Miss.2007), wherein a contractor sought reimbursement of fees not paid. With regard to the measure of damages recoverable by a contractor based on quantum meruit, the Mississippi Supreme Court stated:
Whatever the measure of damages, they may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty.... [However, t]he rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage *1050 is certain, the fact that its extent is uncertain does not prevent a recovery.
Id. at 516 (¶ 62) (citations omitted).
¶ 29. It is clear Stubbs provided ample documentation to prove he incurred substantial damages as a result of the Falkners’ refusal to pay him for his work on their home. He provided the circuit court with daily records of his hours and his workers’ hours on the job and invoices for the materials purchased by Stubbs and used on the job. The circuit judge’s application of quantum meruit to the case in his effort to determine a reasonable fee per hour does not render the award unjust. Stubbs’s losses were adequately documented in his records. The circuit judge merely used quantum meruit to determine the exact hourly fee reasonable under the circumstances. Furthermore, the application of quantum meruit is the very reason Stubbs’s $25-an-hour fee was reduced to $20 an hour, thereby benefitting the -Falk-ners. This issue is meritless.
III. Award of Interest and Attorney’s Fees
¶ 30. Finally, the Falkners claim the circuit court erred in awarding pre-judgment interest and post-judgment interest as well as attorney’s fees to Stubbs. In support of their argument, the Falkners merely state:
Mr. Stubbs and his attorney say they were unaware of the holdings in Southland Enterprises [sic], Inc. v. Newton County, Miss., 838 So.2nd [sic] 286 (2003) [sic], and Stanton & Associatess [sic], Inc. v. Bryant Construction Company [sic], Inc. [sic], 464 So.2nd [sic] 499 (1985) [sic], in which the Court has held that attorney fees and pre-judgment interest are not allowed in quantum meru-it suits.
¶ 31. A review of the cases cited by the Falkners supports their theory that quantum meruit cases prohibit an award of interest or attorney’s fees. We have held: “Quantum meruit is the measure of liability for a contract implied in law, and neither attorney’s fees nor prejudgment interest are available in a suit in quantum meruit.” McLain v. West Side Bone and Joint Center, 656 So.2d 119, 123 (Miss.1995) (citation omitted). Because the instant case involves a contract implied in law between the Falkners and Stubbs and is, therefore, a quantum merit suit, the circuit court’s award of pre-judgment interest and attorney’s fees was improper. However, nothing prohibits the circuit court’s assessment of post-judgment interest. The assignation of post-judgment interest was permissible. Accordingly, we reverse and remand the case to the circuit court for a determination of Stubbs’s award without the inclusion of pre-judgment interest and attorney’s fees.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF CHICKASAW COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANTS AND THE AP-PELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR.