ON WRIT OF CERTIORARI

DICKINSON, Presiding Justice, for the Court:
¶ 1. Attorneys representing the admin-istratrix of an estate settled wrongful-death claims under two insurance policies without filing a wrongful-death lawsuit. The proceeds of the settlement of the first policy were distributed equally to the wrongful-death beneficiaries. The attorneys submitted the proceeds of the second policy to the chancery court and moved for an unequal distribution, arguing that two half-siblings should recover nothing or, if allowed to recover, less than the three other claimants.
¶ 2. The chancellor determined that the half-siblings were entitled to recover, and that she had no authority to apportion the wrongful-death settlement proceeds unequally. She divided the proceeds equally among the wrongful-death beneficiaries after awarding attorneys’ fees of forty percent of the amount of recovery. Two of the beneficiaries argued that they should not be required to pay attorneys’ fees because the attorneys had made numerous attempts, first to exclude them from any recovery, and then to reduce their share.
¶ 3. The Court of Appeals affirmed the chancellor’s determination that the half-siblings were entitled to an equal distribution but remanded for factual findings on the amount of attorneys’ fees they should be required to pay.[1] We agree with the Court of Appeals and the trial court that the proceeds must be equally divided. On the issue of attorney fees, four justices on this Court would hold that, because the attorneys had an actual conflict of interest with the half-siblings and acted adverse to their interests; and because they could not satisfy the requirements for quantum me-ruit, they were not entitled to recover any attorneys’ fees from the half-siblings shares. Four justices would affirm the Court of Appeals.
FACTS AND PROCEDURAL BACKGROUND
¶ 4. The facts necessary to adjudicate the issues presented are not in material *863 dispute. In 2006, sixteen-year-old Dane Eubanks was killed in an automobile accident. His mother, Cecilia Borries, contracted with David E. Kiyhet Sr. to: .
provide legal services in connection with a Wrongful Death occurring on- February 28, 2006 in- Jackson County Mississippi, Law Firm shall provide those legal services reasonably required to represent Client....
Cecilia agreed to pay Kiyhet a $5,000 retainer and $150 per hour and, should additional insurance be found, “forty-percent (40%) of all monies or equivalent collected in the event of settlement or trial” in lieu of the hourly rate. The contract between Cecilia and Kiyhet did not purport to grant Kiyhet the authority to represent anyone other than “Client” — defined in the contract as Cecilia Borries.
¶ 5. After she was appointed adminis-tratrix of Dane’s estate, Cecilia petitioned the chancery court to approve “the Legal Contract between the Petitioner [Cecilia, as “Administratrix of the Estate of DANE RICHARD EUBANKS”] and the Honorable DAVID E. KIYHET, SR.” No mention was made of the wrongful-death beneficiaries.
¶ 6. At the time of his death, Dane was unmarried and had no children, so any distribution of the statutory wrongful-death damages must be distributed in equal shares to the second tier of statutory wrongful-death beneficiaries, which includes his mother, father, sisters and brothers, including half-blood siblings.[2] Because Dane’s father had, played no role in'Dane’s life, Kiyhet filed a motion seeking to terminate his parental rights and to preclude him from sharing in the wrongful-death benefits.
¶ 7. On August 7, 2008, the chancellor granted the motion, declaring that David’s parental rights were terminated, and that he was “precluded, enjoined!,] and restrained from being a beneficiary of any Wrongful Death proceeds that may be recovered due to the wrongful death of DANE RICHARD EUBANKS.” Because no appeal was taken from this ruling, we shall not address it.
¶8. At this point, Cecilia and Kiyhet learned of the' possibility that Dane’s -father had fathered two children — David Eu-banks Jr. and Allison Eubanks — -with Kathy May Huber. On December 12, 2008, Huber made an appearance in the chancery court proceedings through counsel, Jane Perry, on behalf of David Jr. and Allison. A DNA test confirmed that David Jr. and Allison were David1 Sr.’s children and Dane’s half-siblings.
¶ 9. So Dane’s statutory wrongful-death beneficiaries at the time of his death were his mother, Cecilia, his father, David Eu-banks (whom the chancellor had precluded from recovery), a brother, Seth, a maternal half-brother, Aiden Borries, and a paternal half-brother, David Eubanks Jr. and half-sister, Allison Eubanks.
¶ 10. On March 11, 2009 — after obtaining a chancery-court determination of Dane’s wrongful-death beneficiaries (Cecilia, Seth, Aiden, David Jr., and Allison), but before filing a wrongful-death lawsuit — Kiyhet reached a settlement in the amount of $100,000 with Allstate Insurance Company, the ‘tortfeasor’s liability insurance carrier. This settlement was approved by the chancellor on September 29, 2009. From the $100,000 proceeds, Kiyhet received $40,000 in attorney fees, and the remaining funds, after payment of "expenses, were equally distributed to Dane’s wrongful-death beneficiaries, as determined in the chancellor’s March 11, 2009 order. The distribution of these settle *864 ment proceeds is not at issue in the case before us.
¶ 11. Meanwhile, Cecilia — who was married to Dane’s stepfather, Kenneth Borries — filed an uninsured-motorist claim against- her husband’s commercial-vehicle insurance carrier, Allstate, claiming that Dane was covered as a “foster child” under that policy. Allstate disagreed and filed a declaratory-judgment action in the United States District Court for the Southern District of Mississippi, asking the court to declare that'no uninsured-motorist coverage existed for Dane under Borries’s Allstate-policy. The Estate and Cecilia filed a counterclaim arguing that Dane was covered by Borries’s policy and that he was entitled to uninsured/underinsured-motorist insurance coverage.
¶ 12. Kiyhet associated Vincent Castig-liola Jr. as cocounsel to assist with the uninsured-motorist litigation. against Allstate. Kdyhet shared with Castigliola the $40,000- fee already collected under the $100,000 policy and agreed to split future attorneys-’ fees. The matter proceeded in federal court, with the Allstate attorneys battling Kiyhet and Castigliola. We think -it important to point out that Cecilia’s attorneys never claimed to be representing David Jr.’s or Allison’s interests. During a later argument before the chancellor, Castigliola stated:
I represented as co-counsel with Mr. Kiyhet the administratrix of the estate and Cecilia was sued individually and the pleadings are attached more than once as exhibits. My representation dealt with the defense of the declaratory judgment action and the counterclaim directly asserted against Allstáte Indemnity Company_ .
¶ 13. Cecilia and Allstate eventually agreed to settle the matter for $250,000. But when the settlement was referred to the chancery court for approval and distribution of proceeds, Cecilia’s attorneys strenuously objected to an equal distribution of the proceeds.
¶ 14. First, they argued that the DNA test results had been presented too late to satisfy Section 91-1-15’s statute of limitations to establish paternity. The chancellor, later finding the statute was satisfied because David Sr. was listed as the father on David Jr.’s and Allison’s birth certificates, rejected this argument.
¶ 15. Next, they argued that the matter in federal court was not related to a wrongful-death claim, and that the proceeds of the settlement were not for a wrongful-death claim. In representing to the chancellor that he did not recall the settlement being a wrongful-death settlement, Mr. Castigliola stated:
Nor do I recall any discussion regarding a settlement of any and all claims. What we[were] there to settle was simply what was the relief sought. This was a declaratory judgment action, it named only Cecilia Eubanks, individually and as an administratrix of the estate. It did not refer to her as a wrongful death representative. And it just is what it is.
¶ 16. Next, realizing the chancery court 'previously had adjudicated David Jr. and Allison to be wrongful-death heirs in connection with the $100,000 settlement, Cas-tigliola filed a motion to set aside the previous adjudication of wrongful-death heirs and exclude David Jr. and Allison. Castigliola also took the position that, even if David Jr. and Allison were wrongful-death beneficiaries, all of the proceeds should go to the estate, which would exclude David Jr. and Allison, who, even if they were wrongful-death beneficiaries, were not heirs to the estate.
¶ 17. In advancing these positions, Cecilia and the Estate sought clarification from the federal court as to what claims the federal court case and settlement en *865 compassed. The federal court found that there was a valid meeting of the minds to settle “all of the claims by the Estate which included a later division by the Estate to the five adjudicated heirs and wrongful death- beneficiaries.” - It further found that “how the proceeds are divided within the Estate is left to be determined by the Chancery Court.” '
¶ 18. Castigliola then urged the chancery court to recognize and adjudicate claims for Cecilia, Seth, and Aiden for loss of society and companionship. This would result in a larger distribution for them at the expense of David Jr. and Allison.
¶ 19. The chancellor rejected all of these arguments and divided the settlement proceeds equally among Cecilia, Seth, Aiden, Allison, and David Jr. The chancellor held that any attempt by -the chancery court to divide the settlement unequally “would remove this matter from the purview of the Chancery Court as such matters are ‘as the jury may determine....’”
¶20. The chancellor also found that, while David Jr. and Allison were not bound by the contingency fee contract, they had benefitted from the attorneys’ work on the settlement. She' determined the amount of attorneys’ fees that David Jr. and Allison would owe Kiyhet and Cas-tigliola based upon quantum meruit would greatly exceed the forty-percent contingency fee,-so she-held that a forty-percent fee was “reasonable and more beneficial to the children than a quantum meruit based calculation.”
¶ 21. Huber appealed the award of attorneys’ fees against David Jr. and Allison, and Cecilia and the Estate cross-appealed, arguing that the chancellor erred by dividing the settlement equally between the wrongful-death beneficiaries. The Court of Appeals'-affirmed the chancery court’s decision to divide the settlement equally between the wrongful-death beneficiaries, but reversed the chancellor on the issue of attorneys’ fees, and remanded for further proceedings for the chancellor to determine entitlement to the claimed fee and to provide express findings, in support thereof.[3] The Court of Appeals further held that any award should also be supported by.findings sufficiently distinguishing .the legal costs incurred by Castigliola and Ki-yhet in pursuing legal matters adverse to David Jr. and Allison in the federal court action relating, to the Allstate settlement of the second wrongful-death claim.[4]
¶ 22. Judge Roberts, concurring in part and dissenting in part, argued that “the chancellor did have jurisdiction to divide the settlement” and that the chancellor should “hear evidence from the beneficiaries and-properly divide the settlement among the wrongful-death beneficiaries.”[5]
•¶ 23. The Estate filed a petition for writ of certiorari with this Court, arguing that Court of Appeals decision was in error. We granted certiorari to elaborate on our decision in Long v. McKinney.[6]
ANALYSIS
I. Whether, after a wrongful-death claim has been decided by a júry, or has been settled, a chancellor has authority to entertain a new claim for loss of society and companionship.
¶ 24. This Court was crystal clear in Long v. McKinney that the chancery *866 court’s jurisdiction in wrongful-death litigation may be invoked in only three instances: (1) for opening the decedent’s estate so that beneficiaries may pursue a wrongful-death claim in the circuit court; (2) for the approval or rejection of a minor’s wrongful-death settlement; and (3) to determine wrongful-death beneficiaries.
¶ 25. No authority exists for a party to file a new wrongful-death claim for damages in the chancery court, nor is there authority for a chancellor to apportion individual claims for loss of society and companionship.[7] For these reasons, we must reject any notion that the chancery court in this case had the power to consider and divide the damages for loss of society and companionship unequally. As we stated in Pannell v. Guess, a case directly on point, “the chancellor had no choice but to distribute the insurance settlement proceeds ... [to the wrongful-death beneficiaries], equally.”[8]
¶ 26. When a wrongful-death case has concluded by jury verdict or settlement, the proceeds must be divided according to the jury’s verdict or the terms of the settlement agreement. And where no provision is made for any award for loss of society and companionship, a chancellor who is asked to distribute the proceeds must distribute them according to the terms that were decided by the jury or, as here, by the parties to the settlement. Parties wishing to pursue a claim for loss of society and companionship must do so before settling the case.
¶ 27. A chancellor has no choice but to distribute the funds equally.[9] Had this case been tried in circuit court, with a jury award to one of the parties for loss of society and companionship, or had the parties settled with an agreement to such an award, then the chancellor certainly could distribute the proceeds accordingly.[10]
II. Whether Long v. McKinney held unconstitutional or “odious” Section 11-7-13’s provisions concerning the division of damages.
¶,28. In his dissent, my learned and esteemed colleague, Justice Kitchens, incorrectly reports that, in Long, we “[ostensibly” found “the equal distribution of loss of society and companionship damages to be constitutionally odious.” We did not.
¶29. In Long, this Court recognized that Section 11-7-13 requires an equal division among the wrongful-death beneficiaries of all damages the decedent could have recovered for negligent acts “as would, if death had not ensued, have entitled the party injured or damaged thereby to maintain an action and recover damages in respect thereof ...,” such as the net present value of the decedent’s life, medical expenses, pain and suffering, and lost wages.[11]
¶ 30. But we also noted that “all parties interested may join in the suit;” that “there shall be but one (1) suit for the same death which shall ensue for the benefit of all parties concerned;” and “in such action the party or parties suing shall recover such damages allowable by law as the jury may determine to be just, taking into consideration all the damages of every kind to the decedent and all damages of *867 every kind to any and all parties interested in the suit.” [12]
¶ 31. We did not speak to the constitutionality of these provisions. But we did interpret the statute to mean that the wrongful-death damages must be divided equally among the wrongful-death beneficiaries, and that individual damages due to a particular party may be recovered by that party. Our interpretation in Long of the statutory provisions concerning the division of damages is best understood by way of an example.
¶ 32. Suppose a defendant caused the wrongful death of a man who left behind two wrongful-death beneficiaries — a wife who had lived with him for fifty years and cared for him day and night during his final illness, and a forty-year-old son who hated his father and had not visited, called, or seen him in twenty years. And further suppose a jury returned a verdict of $1 million in wrongful-death damages for the man’s pain, suffering, lost wages, and the net-present value of his life, plus an award of $500,000 to his wife for her loss of society, companionship, and consortium. All agree the statute requires that the wife and son must equally share the $1 million in wrongful-death damages. But Justice Kitchens interprets Section 11-7-13 to require that the wayward son, who cared nothing for his father, receive half the money the jury awarded the man’s wife for her individual loss of society, companionship, and consortium. Long interpreted the statute otherwise.
¶ 33. Our discussion of the constitutionality of previous interpretations of Section 11-7-13’s procedural requirements — which had nothing to do with the division of damages — began with the following:
The case before us should be, procedurally at least, an uncomplicated case. However, previous attempts to interpret the procedural provisions of our Statute have complicated wrongful death litigation, and have provided our trial judges and trial bar with unnecessary difficulty. Accordingly, we must now meet our constitutional responsibility by scrutinizing the Statute for those matters which are judicial (including procedural provisions), and by establishing the procedure to be followed in wrongful death litigation, those provisions notwithstanding.[13]
¶ 34. Our first procedural concern was that the provisions of Section 11-7-13 had been interpreted “to allow a suit by the personal representative, or by the wrongful death heirs, but not by both,” meaning courts had interpreted the statute “to provide exclusive authority to a wrongful death beneficiary who files suit to pursue the claims of the estate.”[14]
We elaborated by pointing out that, according to the record in the Long case, we had an excellent trial judge with many years experience on the trial bench, and excellent lawyers with many years of litigation experience, who believe[d] that, under the Statute, [one of the wrongful-death beneficiaries who also was the sole beneficiary under the decedent’s will was allowed to] prosecute the case on behalf of all persons entitled to recover, with or without them consent; and that, absent her agreement, other claimants [were] prohibited from joining in to participate in the litigation with counsel of their choice.[15]
¶ 35. We then pointed out the numerous conflicts of interest this previous pro *868 cedural interpretation produced, including that:
the attorney 'who represents the first heir to file “controls” the litigation, and represents all heirs (whether they'agree to such representation or not), and that the* attorney is not only justified, but indeed compelled, by [these interpretations of] the Statute to oppose his “clients,” shoüld théy attempt to join the litigation'with counsel of their choice.[16]
¶ 36. And, in summing up the point, we stated:
By our decision today and the procedure announced below, we intend to eliminate the inherent conflict of interest, and simplify the decisions to be made by trial Courts where more than one heir wishes to participate in the litigation to protect their individual interests. We also address the dilemma faced by counsel who have seemingly been forced into the uncomfortable position of representing a client with convicts of interest, .
The resolution of this case, requires only that we address, appropriate practice and procedure .in wrongful death litigation, No substantive law is involved,[17]
¶ 37. We then discussed joinder of parties, as controlled by Mississippi Rule of Ciidl Procedure 19, and the role of the chancery court under current statutes and procedural rules; and we then set down the procedural rules to be followed, including the absence of authority to consolidate separate suits, the joinder of parties, control of the litigation, and the duties and obligations of counsel:
¶ 38. Our discussion of individual claims for damages under Section 11-7-13 did not find the statute “constitutionally odious.” We did no more than interpret the statute as allowing individuals with claims for loss of society and companionship to recover those damages individually. Specifically, in. our discussion of potential conflicts of interest, we stated:
For instance, the estate is entitled to recover funeral costs and final medical expenses. The beneficiaries are entitled to recover for their respective claims of loss of society and companionship. The wrongful death beneficiaries are entitled to recover the present net cash value of the decedent’s continued existence.... A disinherited heir who is also a wrongful death beneficiary will have no interest in pursuing claims for the estate. The representative - of the estate will have no interest in pursuing recovery for the disinherited heir. Each beneficiary must consider whether to bring their own individual claim for loss of society and companionship. A spouse may have a claim for loss of consortium. Where there is a limited fund for recovery, the potential for conflicts of interest, real and apparent, are enormous.[18]
¶ 39. This language by no means was a determination that Section 11-7-13, or any part of it, was unconstitutional. Instead, we provided a reasonable interpretation of the statutory provisions that address the division of the various kinds of damages, and we found that the statute allows individual claims for loss of society, companionship, and consortium.[19]
¶ 40. Likewise, in Caves v. Yarbrough,[20] we recognized — without disagreement from, any justice — that:
*869 cases filed pursuant to our wrongful-death statute may involve more than one kind of claim. For instance, in addition to claims the decedent could have brought ‘if death had not ensued,’ there may be individual claims of loss of consortium, society and companionship, [21]
¶ 41. Justice Kitchens cites several cases, none of which hold that loss of society, companionship, and consortium damages suffered, by one person must be divided equally among all wrongful-death beneficiaries, and all of which are easily distinguished from our holding in Long. The most glaring example is his citation of Pannell v. Guess,[22] from which he provides the following quote: “the wrongful death statute does not provide that the lower court may conduct a hearing to determine how to divide the proceeds. In fact, the statute provides that the funds ‘shall be equally distributed.’ ”[23]
¶ 42. Justice Kitchens’s quote is accurate, but he fails to point out that, in Pannell, no one had filed suit for individual damages, nor had anyone sought them or negotiated for them prior to the settlement. Prior to any suit being' filed, the unmarried minor decedent’s father, David Pannell — who had been appointed administrator of her estate — settled the wrongful-death claim with the tortfeasor’s insurance company and deposited the proceeds in the registry of the chancery court.
¶ 43. When a dispute later arose about distribution of the proceeds, the Pannell Court correctly held that the chancery court (the lower court referred to in Pan-nell ) had no authority to “conduct a hearing to determine how to divide the [settlement] proceeds.”[24] At that stage of the proceedings, any division by the chancery court other than an equal division among the wrongful-death beneficiaries would have been error. Damage claims for an individual’s loss of society and companionship and loss of consortium would have to have been made in a properly filed lawsuit in the circuit court, or negotiated for in settlement. In Pannell, as in the case before us today, by the time the settlement agreement reached the chancery court, it was too late for someone to make a new claim for recovery. And because Pannell said nothing different from our holding in Long, we had no reason to overrule it.
¶ 44. The question.of whether a family member may join an individual claim for loss of society, companionship, and consortium in a properly-filed wrongful-death lawsuit is not before us. In this case, as in Pannell, no wrongful-death lawsuit was ever filed. The chancellor correctly held that she did not have the power or authority to divide the proceeds of the settlement unequally.
¶ 45., As an afterthought, and as another reason for our disagreement with Justice Kitchens’s views, we point out that, a decade ago in Long, we interpreted Section 11-7-13 as allowing an individual claim.and recovery for loss of society, companionship, and consortium. We have continued to apply that interpretation in cases such as Caves, discussed above. That interpretation was left intact in 2013 when the Legislature reenacted Section 11-7-13. This presents the question of whether— even if Justice Kitchens’s interpretation of the statute were correct — it is precluded by stare decisis.
*870 ¶ 46. In Caves, we were called upon to decide whether the statute of limitations for the Mississippi Tort Claims Act was subject to a discovery provision.[25] Although no discovery provision can be found within the statutory language, prior decisions by this Court had held that a discovery provision applied.[26] And, after those decisions recognizing a discovery provision, the Legislature had reenacted the statutes without correcting our interpretation.[27] This caused us to consider whether the Legislature’s failure to act was an endorsement of our previous interpretations of its statutes, and whether those previous decisions should be followed pursuant to the doctrine of stare decisis.[28] We concluded and held as follows:
While we do not agree that the Legislature’s mere silence is enough, we do agree with the view offered by Justice Roberts in Helvering v. Hallock, 309 U.S. 106, 130-32, 60 S.Ct. 444, 84 L.Ed. 604 (1940), that congressional re-enactment of a statute creates a presumption of legislative approval of the Court’s pri- or interpretations of that statute. This threshold test for application of stare decisis has been followed in numerous cases. For instance, in Lorillard, Div. of Loew’s Theatres, Inc. v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), Justice Marshall noted, “Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.”[29]
¶ 47. We agree with this reasoning and hold that — in cases where this Court con-eludes a statute was incorrectly interpreted in a previous case — we will nevertheless continue to apply the previous interpretation, pursuant to the doctrine of stare deci-sis, upon finding the Legislature amended or reenacted the statute without correcting the prior interpretation.[30] In our view, such action on the part of the Legislature amounts to incorporation of our previous interpretation into the reenacted or amended statute.[31]
¶ 48. We find the chancellor in this case correctly concluded that she was without authority to entertain claims of loss of society and companionship, or to unequally divide the wrongful-death settlement proceeds.
III. Whether the chancellor erred by granting Castigliola and Kiyhet any award of attorneys’ fees from the portion of the settlement due to David Jr. and Allison.
¶49. The chancellor recognized that David Jr. and Allison had no contract or agreement with Kiyhet or Castigliola, and that they were not bound by the forty-percent provision concerning attorney’s fees. Then,, based on the attorneys’ estimates of hours spent working on the case, she calculated what would be the attorneys’ fees on an hourly rate basis under the doctrine of quantum memit. And because that amount exceeded forty percent, she granted the lawyers a fee of forty percent.
¶ 50. As the chancellor noted, David Jr. and Allison were not contraetual *871 ly obligated to pay Castigliola and Kiyhet anything. It is true that the absence of a contract does not preclude a recovery of attorneys’ fees on a quantum meriut basis. But four justices would find that, under the facts of this case, the chancellor erred by finding the elements necessary for quantum meruit were met. For quantum meruit to apply, the chancellor must find that “(1) valuable services were rendered or materials furnished,” and (2) that they were furnished “for the person sought to be charged.”[32] The chancellor also must find (3) that the “services and materials were accepted by the person sought to be charged, used and enjoyed by him,” and (4) under the circumstances, it was understood that the person performing such services expected to be paid by the person sought to bd charged.[33]
¶ 51. Here, the second element clearly was not satisfied. Castigliola and Kiyhet were retained to represent the estate and engaged in settlement negotiations on-behalf of the estate. What is more, Castigli-ola argued that he never represented David Jr. and Allison; he actively sought to preclude their recovery altogether of any portion of the settlements; he attempted to have the chancellor change her prior adjudication of beneficiaries and exclude David Jr. and Allison; and he worked to reduce the portion they finally obtained.
¶52. Four justices find that these attorneys who were actively litigating against the half-siblings’ interests — and with whom they had an actual conflict of interest — cannot be found to have been rendering legal representation “for the person sought to be charged,” as required for a quantum meruit award. We would find the attorneys’ own arguments and actual conflict of interest are dispositive, and they were not entitled to recover any attorneys’ fees from David Jr. and Allison. But because a majority of justices have not voted to reverse the Court of Appeals, its opinion and holding on this issue for this case must stand.
CONCLUSION
¶ 53. We affirm the chancellor’s finding on the cross-appeal that, under the facts of this case, the settlement proceeds must be equally divided and we also affirm the Court of Appeals on this issue. And because a majority of justices have not voted to reverse- the Court of Appeals with respect to the issue of attorney fees, its opinion and holding on this issue, reversing in part and remanding, for this case must stand.
¶ 54. AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
WALLER, C. J., LAMAR AND COLEMAN, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND CHANDLER, J.; KITCHENS, J., JOINS THIS OPINION IN PART. PIERCE, J., NOT PARTICIPATING.

. Estate of Eubanks v. Eubanks, No.2012-CA-00030-COA, 197 So.3d 878, 880, 2014 WL 211730, at *2 (Miss.Ct.App. Jan. 21, 2014).

. Miss.Code Ann. § 11-7-13 (Rev. 2004).

. Estate of Eubanks, 197 So.3d 878, 892, 2014 WL 211730, at *14.

. Id.

. Id, at 894, at *15 (Roberts, J., concurring in part and dissenting in part).

. Long v. McKinney, 897 So.2d 160, 174-176 (Miss.2004).

. Id. at 174-176 (Miss.2004).

. Pannell v. Guess, 671 So.2d 1310, 1314 (Miss.1996).

.Id.

. See Long, 897 So.2d at 169 ("The beneficiaries are entitled to recover for their respective claims of loss of society and companionship.”).

. Id. at 168 (citing Miss.Code Ann. § 11 — 7— 13).

. Long, 897 So.2d at 168 (emphasis added).

. Id. at 163 (emphasis added).

. Id. at 168 (internal citations omitted).

. Id. at 168-69.

. Id. at 170-71.

. Id. at 171 (emphasis added).

. Id. at 169,

. Id.

. Caves v. Yarbrough, 991 So.2d 142 (Miss.2008).

. Id. at 148-49 (emphasis added).

. Pannell v. Guess, 671 So.2d 1310 (Miss.1996).

. Id. at 1314.

. Id. .

. Caves, 991 So.2d at 146.

. Id. at 150.

. Id. at 153.

. Id. at 150.

. Id. at 153.

. Id. at 153-154.

. Id.

. Tupelo Redevelopment Agency v. Gray Corp., Inc., 972 So.2d 495, 514 (Miss.2007) (quoting In re Estate of Fitzner, 881 So.2d 164, 173-74 (Miss.2003)) (emphasis added).

. Tupelo Redevelopment Agency, 972 So.2d at 514-15 (quoting In re Estate of Fitzner, 881 So.2d at 173-74).